# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

ANH THE DUONG,
Defendant and Appellant.

S114228

Los Angeles County Superior Court
BA240170

August 10, 2020

Justice Corrigan authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Liu, Cuéllar, Kruger, and Groban concurred.

PEOPLE v. DUONG

S114228


Opinion of the Court by Corrigan, J.


Defendant Anh The Duong shot and killed four nightclub patrons after an argument. He was convicted of three counts of first degree and one count of second degree murder with a multiple murder special circumstance and various gun use enhancements.[1] The jury returned a death verdict.[2] We affirm.

## I. BACKGROUND

### A. *Guilt Phase*

#### 1. *Prosecution Evidence*

On the evening of May 5, 1999, Thi Van Le went to the International Club in El Monte to attend a birthday party for Khiet Diep. The party of at least seven sat at a table near the restroom. Diep belonged to the Wah Ching gang, and Anthony Tran, Hoa Truong, and defendant were Lao Family gang members. The other three attendees were Le, Duc Nguyen, and a man named "Khuong." None of the latter three were identified as gang members. At some point, Le went to the restroom and heard Tran arguing with three or four Asian men. Minh Tram,

---

[1]     Penal Code sections 187, subdivision (a), 189, 190.2, subdivision (a)(3), 12022.5, subdivision (a), 12022.53, subdivisions (b)–(d).

[2]     The trial court stayed sentence on the various enhancements.

a member of the Black Dragon gang, eventually joined the argument.

After this encounter, defendant went toward the bar area where Tram and others sat in a booth.  Ten to 15 minutes after the argument, Le saw defendant shoot into the booth with a handgun.  John Bui, a co-owner of the club, stood up from the booth and grabbed at defendant, who evaded Bui and continued firing between nine to 13 shots, which took 10 to 15 seconds.  Le did not see anyone shoot at defendant.  Tran testified that he did not see anyone threaten defendant or their group.

Bui testified he saw an argument between two groups, which included defendant and Minh Tram.  He told the men to stop arguing and, in an effort to diffuse the situation, he brought Tram to his booth.  Defendant and his group returned to the table near the restroom.  Those in Bui's booth included Thi Hoa Tang, Lan Thi Dang and her sister, Robert Norman, and others.  Bui heard a loud sound and saw defendant shooting at the group. Bui, who was sitting outermost in the booth, tried to grab defendant but fell to the ground as defendant continued shooting.  Bui did not see anyone threaten defendant or point a gun at him.  Bui reviewed a photospread and identified defendant as the shooter but was afraid to confirm his selection. Bui was later a reluctant grand jury witness.

Tram, Tang, and Norman were pronounced dead at the scene.  Dang died at the hospital.  Tram had been shot once in the back of the head.  Three other shots struck his left side, arm, and chest.  Tram likely lost consciousness after the first shot. His wounds were consistent with the shooter firing downward from a position slightly behind the victim.  Tang was shot four times, including once in the temple.  Norman was shot once in

the back, which was consistent with him being struck as he attempted to crawl away from the booth. Dang was also struck once by a bullet that pierced her arm, then hit her lung, heart, and liver. None of the various wounds appeared to have been caused by rounds that ricocheted off of the booth table. There was no evidence that a bullet had pierced one victim then entered another.

Police recovered 10 expended shell casings, all fired from a .45-caliber semi-automatic handgun. Nine bullets were also recovered, including two from Tang's body and one from Dang's. All bullets and casings came from the same gun. A .40-caliber handgun fell out of Tram's back waistband as his body was moved. No evidence suggested the gun had been fired. A firearms expert opined that the trajectory of the bullets was consistent with the shooter firing into the booth from the front at a downward angle.

The day after the shooting, Diep went to Khuong's house and retrieved a videotape of the events. He eventually burned the tape in a backyard barbecue.

Le had been working as a confidential informant after a drug arrest. On the night of the shooting, he was looking for a murder suspect in an unrelated case. He had previously been paid $300 for information but was not being paid at the time of the shooting. He had no agreement for a disposition of his drug case.

Cellular phone records showed numerous calls the morning after the shooting between Tran, Diep, Nguyen, and a phone registered to defendant's girlfriend.

Defendant was arrested in July 2001 after a lengthy investigation. The search of a Ford Expedition revealed

identification in the name of Long Hoang but bearing defendant's photo. A loaded .45-caliber handgun, along with credit cards in the names of Hoang and Christine Chen, were also recovered. The gun had not been used in the shooting. At the time of the murders, defendant lived with his girlfriend Cindy Hoang. A search of their residence revealed another .45-caliber handgun belonging to defendant, who worked at a gun range and was proficient with firearms.

2. *Defense Evidence*

Khiet Diep, a manager at the International Club, initially testified he did not see any fights or arguments on the night in question. He ran from the club when he heard, but did not see, the shooting. He denied telling police otherwise. He did not view or burn a videotape. He did not remember several calls made to his cell phone after the shooting. On cross-examination, he identified defendant as the shooter and admitted hearing an argument in the restroom before the shooting. He denied telling police that defendant and Tram were arguing over a woman.

Hoa Truong testified he was at the club. Before the shooting, he saw a man in a trench coat walk in and out. Someone told Truong the man was armed. As Truong was preparing to leave, he heard gunshots and saw defendant and the man in the trench coat struggling over something. He denied telling a defense investigator that defendant could not have been the shooter because defendant ran out of the club ahead of him. Shortly after the shooting, Truong and defendant fled to Austin, Texas. A defense investigator testified regarding his interview with Truong.

Los Angeles County Sheriff's Detective Christine Carns related various interviews conducted during her investigation.

Bui said he grabbed the shooter's arm and the shooting continued as Bui fell to the ground. Tram told Bui he and the shooter argued about a shooting at a different nightclub called Passions. In his interview, Le said Tram "was walking around 'cuz he packing," which Carns interpreted to mean Le believed Tram had a gun. Le also told police that Diep approached defendant's table after the argument and defendant asked in Chinese, "Do you want me to do him now?" which Le interpreted to mean shoot the victim.[3] Diep told police defendant and Tram argued "over a girl from another bar named Passions."

### B. *Penalty Phase*

The prosecution presented evidence of defendant's involvement in four uncharged robbery-related shootings, two before and two after the murders. Thien Tang owned a supermarket in San Jose. On May 3, 1997, while bringing $300,000 in cash from a bank to the market, two men accosted him and demanded the money. Defendant shot Tang in the leg and took the bag of cash. The assailants fled, but a market employee, Chau Quach, gave chase. Defendant fatally shot Quach. Defendant admitted the crime to his girlfriend Christine Chen, and Tang identified defendant in a lineup after the robbery.

On August 28, 1998, three masked men with guns tried to enter the property of Wintec Industries in Fremont. Security guard Ted Garcia was shot but survived. Employee Hsu Pin Tsai was killed as he tried to drive away. The men escaped in a white van. The van was later stopped but defendant was not

---

[3] Le testified during the prosecution's case that he heard defendant say, "What do you want?" to which Diep replied, "[W]e'll see."

with the four men inside. The van contained diagrams of the Wintec facility bearing defendant's fingerprints. The diagrams showed the location of various expensive computer parts. A phone associated with defendant was in constant contact with the perpetrators around the time of the incident. Defendant later confessed his involvement to Chen.

Chen testified that she and defendant began "casing" the Traditional Jewelers store in Newport Beach where defendant and others planned to steal watches. On January 16, 2001, defendant and three other men prepared for the robbery at the apartment defendant shared with Chen. Defendant was armed with an "AK." That evening, three armed masked men ran toward the store. Two men fired at security guard Rafael Gomez, while a third man stood near a planter. Gomez returned fire but was shot in the chest and arm. Glass fragments lodged in his eye and head. Gomez survived but required four surgeries. One of the men fired repeatedly into the front of the store, but they failed to gain entry. The store contained 1,200 watches worth between five and six million dollars. Defendant and the others went to the apartment, where defendant told Chen they had "shot up" the store but "couldn't get anything."

Chen suggested they should rob another jewelry store, so she, defendant, and others drove to Cupertino to case the shop. Chen was to watch the business until she saw the security guard go inside, and then alert the others. Two weeks later, they executed the plan. Defendant and three others entered wearing dark clothing. Inside, they killed security guard Joseph Cambosa and took $53,000 worth of watches.

Chen testified under a grant of use immunity. Defendant told Chen he supported himself through gambling and armed

robberies. He kept a cache of weapons at their apartment so he could supply guns for his crimes. Defendant explained that he would wear a mask and dark clothes and only stay at the robbery site for 15 to 20 seconds.

Robert Norman's mother and Lan Dang's father and sister gave victim impact testimony.

The defense presented no evidence.

## II. DISCUSSION

### A. *Guilt Phase Issues*

#### 1. *Venue Change*

Defendant challenges the denial of his venue change motion.[4] There was no error.

##### a. *Background*

The charged murders happened in May 1999. Arrested more than two years later, defendant sought to change venue, arguing he could not receive a fair trial in Los Angeles County.[5] Defendant submitted printouts of eight news articles. One Los Angeles Times report immediately after the shooting described the incident and identified the victims but did not mention defendant. Another Times article in December 1999 said defendant was wanted for the shooting, described as "an apparent gang-related attack." Three articles were published

---

[4]     Defendant asserts a violation of his rights to due process, equal protection, a fair and impartial jury, and a reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and analogous state constitutional provisions.

[5]     Defendant also moved for a protective gag order. That motion is not at issue here.

on July 18, 2001. They described the shooting and defendant's arrest, also reporting he was a suspect in two previous robbery shootings in San Jose and Fremont. Those articles appeared in the Los Angeles Times, the San Francisco Chronicle, and were carried by the Associated Press. A September 2001 Los Angeles Times article reported on defendant's suicide attempt and repeated he was suspected of killing six people. Two other articles reported on trial proceedings. In July 2002, the San Gabriel Valley Tribune covered a defense motion to discover the names of two of the San Jose witnesses who were in a witness protection program. The Inland Valley Daily Bulletin reported in September 2002 that defendant's *Faretta* (*Faretta v. California* (1975) 422 U.S. 806) motion had been denied. Defense counsel also observed the shooting was featured in a single, May 2000 airing of an episode of *America's Most Wanted*, which named defendant as a suspect. The episode aired only once, to a national audience.

The court deferred ruling on venue, noting that the jury questionnaire addressed pretrial publicity. The court explained, "what I want to do is see if it really manifests itself in terms of the pool that we have at the moment." The court asked how many prospective jurors reported in questionnaires that they had learned something about the case. Defense counsel responded four or five had done so. The court denied the motion but said it would revisit the ruling "if the numbers are substantially different" upon further questionnaire review.

The next day, the court individually questioned three prospective jurors who said that they had heard something about the case. Prospective Juror No. 6274 had read an article in the San Gabriel Valley Tribune about the beginning of jury selection. The court granted the defense challenge for cause

8

because "she read the entire article." Prospective Juror No. 1291 recalled "hearing something about [the case] a couple years ago" on the television news but had no more specific recollection. Prospective Juror No. 5230 remembered reading about the case "right after it happened" because she used to live in El Monte and had a business there. The article reported some people were killed and gave Asian names she did not recognize. She did not recall any article "talking about the perpetrator." The court denied defendant's challenge for cause of these two prospective jurors. They were empaneled as alternates[6] and accepted by the defense.

### b. *The Court Properly Denied the Venue Change Motion*

" 'On appeal from the denial of a change of venue, we accept the trial court's factual findings where supported by substantial evidence, but we review independently the court's ultimate determination whether it was reasonably likely the defendant could receive a fair trial in the county. In deciding whether to change venue, the trial court, and this court in its independent review, considers several factors, including the nature and gravity of the offense, the nature and extent of the media coverage, the size of the community, the defendant's status within the community, and the victim's prominence. On appeal, a defendant . . . must show both error and prejudice, that is, that it was not reasonably likely the defendant could receive a fair trial at the time of the motion, and that it is reasonably likely he did not in fact receive a fair trial.' " (*People v. Rices* (2017) 4 Cal.5th 49, 72 (*Rices*), quoting *People v.*

---

[6] Neither alternate served on the jury.

*Rountree* (2013) 56 Cal.4th 823, 837; see Pen. Code, § 1033, subd. (a).)

Defendant failed to show a reasonable likelihood he could not receive a fair trial in Los Angeles County. A capital murder charge involving the killing of four people "weighs in favor of a change of venue but is not itself dispositive." (*People v. Rountree, supra,* 56 Cal.4th at p. 837.) "Indeed, on numerous occasions we have upheld the denial of change of venue motions in cases involving multiple murders." (*People v. Farley* (2009) 46 Cal.4th 1053, 1083.)

The media coverage here was hardly "sensational and extensive." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1395 (*Leonard*).) Defendant cited only eight print articles about the case published over a period of more than three years. One of the articles appeared in the San Francisco Chronicle, an out-of-market publication not relevant to local publicity. Another was authored by the Associated Press, but there was no evidence any publication carried the story. Of the six remaining articles, one appeared immediately after the shooting and did not name defendant; another reported seven months later he was named a suspect; a third covered his arrest more than two years after the shooting; and a fourth recounted his suicide attempt. The remaining two articles concerned proceedings just before jury selection.

We have affirmed venue change denials in cases with far more publicity. For example, in *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, "the defense presented more than 150 articles from regional newspapers and various videos of television coverage of the case." (*Id.* at p. 44.) The defendant in *Leonard* "cited 556 television segments on the killings that

appeared on local stations, as well as 130 newspaper articles, most of them in . . . the area's largest newspaper. Many of the television news segments and newspaper articles were the lead story. As a result, public awareness of the case was very high." (*Leonard, supra,* 40 Cal.4th at pp. 1395–1396.) *People v. Prince* (2007) 40 Cal.4th 1179 (*Prince*), cited by defendant, involved "a series of six similar murders occur[ring] in a community over a period of approximately one year without a culprit being quickly identified." (*Id.* at p. 1210.) There, "the defense proffered evidence of the more than 270 newspaper articles that had appeared concerning the crimes, the criminal investigation, defendant's eventual arrest in Alabama and extradition, and the preliminary examination." (*Ibid.*) "There was evidence suggesting that television coverage was similar in extent." (*Ibid.*) Despite the "intense" publicity (*id.* at p. 1212), *Prince* affirmed the denial of the defendant's venue motion, noting in part that much of the publicity occurred over a two-year period and predated jury selection by a year. "The passage of time ordinarily blunts the prejudicial impact of widespread publicity." (*Id.* at p. 1214; see *Leonard*, at p. 1396.) This is even more true in a case like this one.

Defendant argues that "a suspect at large for a long period of time can create a sense of fear in a community." While possible, the argument is speculative here. Neither prearrest article mentioned any community fear. Unlike in *Prince,* the killings were not " 'serial' " killings but part of a single incident. (*Prince, supra,* 40 Cal.4th at p. 1211.) Defendant was identified as a suspect within a few months. (Cf. *Id.* at pp. 1210–1211.)

The record confirms the lack of significant publicity. The jury questionnaire asked, "Do you know anything, or have you read or heard anything, about the case?" Of the 142 prospective

jurors, only 10 reported any exposure to coverage of the case.[7] None of the 12 selected jurors responded affirmatively, and only two of five alternate jurors did so. This contrasts with *Prince*, in which "a high percentage of the prospective jurors and 12 of the 13 jurors who actually served at trial . . . had been exposed to the publicity." (*Prince, supra,* 40 Cal.4th at p. 1215.) We nevertheless affirmed the denial of a venue change because "the jurors' responses to the juror questionnaire and voir dire did not disclose any prejudgment or emotional bias." (*Ibid*.) Other cases have upheld a denial even when "a large percentage of the venire had heard of the case." (*People v. Harris* (2013) 57 Cal.4th 804, 825; see *People v. Suff* (2014) 58 Cal.4th 1013, 1049; *People v. Sanders* (1995) 11 Cal.4th 475, 505.)

As to the nature of coverage, defendant argues some details prejudiced him, including a description of the shooting as gang-related, defendant's involvement in unrelated killings and prosecutions, and certain details about the victims. He complains that coverage of his suicide attempt suggested a consciousness of guilt, and reports that he sought to represent himself suggested a conflict with defense counsel. He also claims coverage of his attempt to discover the identity of certain witnesses in an unrelated case suggested those witnesses had reason to fear him. "But while the local coverage disclosed the

---

[7] There were two other affirmative responses, but they were not attributable to pretrial publicity. One person reported he heard about the incident because his wife had previously worked for the owner of the International Club. The other prospective juror responded with the non sequitur, "You have to have 12 people for the case." Six other responses indicated they did not know or were not sure whether they had heard something about the case.

brutal details of the crimes, and elicited their effects on the victims and their families, the reporting was essentially factual, not sensationalized." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1126.) These facts are different from *Leonard*, where "the media consistently described the perpetrator, both before and after defendant became a suspect, as the 'Thrill Killer,' a highly pejorative moniker that was potentially prejudicial to defendant." (*Leonard, supra,* 40 Cal.4th at p. 1395.) Further, the "vast bulk of the local coverage was clustered around the times of significant events in the case." (*Zambrano*, at p. 1126.)

Finally, although the case was covered once on *America's Most Wanted*, the episode aired more than two years before trial began. "Moreover, as *America's Most Wanted* was broadcast nationally, 'a change of venue could not be expected to dilute its prejudicial effect.' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1078.) The nature and extent of media coverage weighed against a venue change.

"The size of the community (Los Angeles County, the largest and most populous in California) was a factor weighing heavily against a change of venue." (*People v. Williams* (1997) 16 Cal.4th 635, 655.) "This is significant because the 'adversities of publicity are considerably offset if trial is conducted in a populous metropolitan area.' [Citation.] That the populous metropolitan character of the community dissipated the impact of pretrial publicity in this case was made clear on voir dire." (*People v. Harris* (1981) 28 Cal.3d 935, 949.) Defendant makes no argument regarding this factor.

He does argue that, because he lived in Orange County, his status as a nonresident and "a reputed gang member who was captured only after a national manhunt" weighed in favor

of a venue change.  Similarly, defendant claims the sympathetic media coverage of the victims elevated their status in the community.  These claims lack merit.  As to status, "there is no indication that either defendant or his victims were prominent in the community."  (*People v. Howard* (1992) 1 Cal.4th 1132, 1167.)  "As a recreational visitor to the county, defendant was relatively anonymous in the community."  (*People v. Adcox* (1988) 47 Cal.3d 207, 234.)  Any notoriety he gained from his national television appearance would either have faded with time or followed him to any county.

" 'When pretrial publicity is at issue, "primary reliance on the judgment of the trial court makes [especially] good sense" because the judge "sits in the locale where the publicity is said to have had its effect" and may base [the] evaluation on [the judge's] "own perception of the depth and extent of news stories that might influence a juror." ' "  (*People v. Famalaro* (2011) 52 Cal.4th 1, 24, quoting *Skilling v. United States* (2010) 561 U.S. 358, 386.)  Only a single factor, the nature and gravity of the offense, weighed in favor of a venue change.  But that factor would apply no matter where the case was tried.  Defendant fails to show the court improperly denied a venue change at the time of the motion.

He also fails to show prejudice.  As noted, "[o]n appeal, a defendant challenging a trial court's denial of a motion for change of venue must show both error and prejudice:  that is, that at the time of the motion it was reasonably likely that a fair trial could not be had in the county, and that it was reasonably likely that a fair trial was not had."  (*People v. Davis* (2009) 46 Cal.4th 539, 578.)  None appears on this record.  Although defendant suggests "extensive media coverage continued throughout [his] trial," he cites only a single article from

January 8, 2003, in the San Gabriel Valley Tribune, published during jury selection. The court itself alerted the parties to the story. None of the sitting jurors indicated they had previously heard anything about the case. " '[W]e are confident the guilt and penalty verdicts were due to the evidence presented at trial and not to a biased jury or the failure to change venue.' " (*People v. Avila* (2014) 59 Cal.4th 496, 513; see *Rices, supra,* 4 Cal.5th at pp. 74–75.)

### 2. *Suppression Motion*

Defendant contends the trial court improperly denied his motion to suppress items discovered during a warrantless search of a Ford Expedition he drove before his arrest.[8] Any possible error was not prejudicial.

### a. *Background*

Between 4:45 and 5:00 p.m. on July 16, 2001, defendant was arrested on a basketball court at a gym in Costa Mesa. Officers recovered several items at the court, including a membership card in Long Hoang's name, a parking lot ticket with a time stamp of 4:23 p.m., a cell phone, and a Ford key. An officer took the key and tried it on various vehicles in the parking lot, where it opened a Ford Expedition registered to

---

[8] See Penal Code section 1538.5, subdivision (a)(1)(A). Defendant claims he was denied due process and his rights to be free from unreasonable searches and arbitrary imposition of the death penalty in violation of the Fourth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and their state counterparts.

Timothy Mukasa.[9]   The Expedition was towed to a police department lot and an inventory search was conducted six hours after defendant's arrest.  A Colt .45-caliber handgun was found in the center console, as well as a check and the credit cards previously described.  (See *ante*, at p. 5.)  The detective who conducted the search testified it was performed pursuant to a standard policy for impound searches.  Three police agencies and 30 officers were involved that day, and officers worked "continually on this case" during the six-hour time span.  They also secured and searched defendant's residence and coordinated with other agencies regarding defendant's outstanding warrants.  Defendant's girlfriend Chen and their roommate were also arrested.  The trial court denied the motion, concluding the Expedition was properly impounded and inventoried.

### b.  *Any Possible Error Was Not Prejudicial*

A warrantless search is presumed to be unreasonable, and the prosecution must demonstrate a legal justification for the action.  The standard of appellate review is well established.  We defer to the trial court's factual findings if supported by substantial evidence.  In determining whether the search or seizure was reasonable, we exercise our independent judgment.  (See *People v. Suff, supra,* 58 Cal.4th at p. 1053.)

---

[9]   There was some confusion about when this occurred.  The officer who found the Expedition initially testified that he was given the Ford key at 11:00 p.m., but later clarified his testimony was based on a report he had written, and he currently had no independent recollection of the actual time.  It was later established that the inventory search occurred at 11:00 p.m.

"When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents.  These procedures developed in response to three distinct needs:  the protection of the owner's property while it remains in police custody [citation]; the protection of the police against claims or disputes over lost or stolen property [citation]; and the protection of the police from potential danger [citation].  The practice has been viewed as essential to respond to incidents of theft or vandalism." (*South Dakota v. Opperman* (1976) 428 U.S. 364, 369; see *Cady v. Dombrowski* (1973) 413 U.S. 433, 442–443.)  The high court in *Colorado v. Bertine* (1987) 479 U.S. 367 upheld the inventory search of a van after the driver was arrested, citing the same concerns expressed in *Opperman.*  (*Bertine*, at pp. 372–374.)

The question is "whether a decision to impound or remove a vehicle . . . was reasonable under all the circumstances." (*People v. Shafrir* (2010) 183 Cal.App.4th 1238, 1247.)  We need not resolve this question because any possible error was harmless. Defendant argues the recovered evidence allowed the prosecutor to paint him as "a bad, dangerous person whose weapon of choice was a Colt .45."  However, other evidence already linked him to both gun ownership and use.  A warrant search of defendant's residence revealed another .45-caliber handgun.  He worked at a gun range and testimony established his proficiency with firearms.  Further, defendant's identity as the shooter here was undisputed.  With respect to the penalty phase, defendant suggests the evidence recovered from the Expedition improperly bolstered Christine Chen's testimony. But such evidence was trivial compared to Chen's extensive testimony regarding defendant's involvement in other shootings, which was corroborated by testimony from the

17

victims of those crimes. Under these circumstances, admission of evidence from the Expedition was harmless beyond a reasonable doubt. (See *People v. Powell* (2018) 6 Cal.5th 136, 159; *People v. Lenart* (2004) 32 Cal.4th 1107, 1125.)

### 3. *Defendant's Decision Not To Testify*

Defendant contends his decision not to testify was not knowing, intelligent, and voluntary. Defendant's contention fails on this record.[10]

#### a. *Background*

During a break in the prosecution's guilt phase case, the prosecutor indicated that if defendant decided to testify, the prosecutor would "question him about other people he has shot" because "that would be critical as to intent on the issue of self-defense." Defense counsel responded he was not prepared to argue the issue and defendant had not yet decided whether to testify. The court declined "to compel the defense to indicate whether or not [defendant] intends to testify," noting such decision is "frequently a question that is directed to a client once all the evidence is in." The court observed that whether impeachment would be proper would depend on the content of defendant's testimony and encouraged the parties to further research the issue. The prosecutor filed a written motion arguing that, if defendant testified regarding self-defense, the

---

[10] Defendant claims violations of his rights to testify, present a defense, compulsory and due process, equal protection, a fair trial, an impartial jury, proof beyond a reasonable doubt, non-arbitrary and reliable guilt and penalty determinations, and his right against self-incrimination under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and their state counterparts.

prosecution should be allowed to cross-examine him about, and present evidence of, four uncharged shootings. The defense filed an opposition.

The issue arose again during the defense case. Defense counsel stated he planned to speak with defendant that afternoon about whether he would testify, and he would make a decision by the following morning. The prosecutor repeated his position as to the scope of impeachment. The court was reluctant to make a ruling "in a vacuum" that "could possibly have a chilling effect on the decision on the defendant of whether or not to testify." The court also commented that "if I make an erroneous ruling on the admissibility of this, I may create an issue on appeal that the defendant didn't exercise his right to testify because of the erroneous ruling." The prosecutor "disagree[d] with the court on the law," noting "for that to be preserved the defendant would have had to actually testify." The court clarified that it would defer ruling until defendant testified on direct.

The next day, defense counsel asked to make an offer of proof as to defendant's testimony and secure a tentative ruling before defendant took the stand. Defense counsel reported defendant would testify he shot Tram in defense of another, then accidentally shot the other three victims while he and Bui struggled over the gun. The prosecutor argued he should be allowed to present evidence of defendant's four other robbery shootings. Defense counsel responded that this case was dissimilar because it was not a robbery and sought an evidentiary hearing regarding the uncharged incidents. The court tentatively ruled that if defendant testified consistently with counsel's offer of proof, it would allow evidence of two incidents: the 1997 San Jose robbery where defendant shot two

people, killing one; and the 1998 Fremont robbery where defendant shot and killed one person. It would exclude evidence of the two incidents where defendant's involvement as the shooter was in question.

Based on the extant state of the record, the court agreed to instruct on heat of passion and accident. The following transpired:

"[Defense counsel]: I would indicate that based on the court's ruling of the court [sic] allowing the voluntary manslaughter as to Mr. Tram and accidental homicide as to the other three victims, Mr. Duong would — is indicating that he will not take the witness stand in this case.

"Again, just to reiterate briefly, it's the defense position as stated previously that it's in violation of Mr. Duong's 4th, 5th, 6th and 14th Amendment rights of the federal Constitution and state Constitution to testify in this matter, and he understands that.[11] However, based on the court's ruling of the two uncharged homicides which are still pending in other jurisdictions, he believes it is in his best interest not to testify.

---

[11] Counsel was apparently suggesting, consistent with earlier arguments, that the court's indication that it would allow the impeachment evidence improperly infringed on defendant's right to testify and present a defense.

"Mr. Duong, you understand that my advice in this case at this time is for you not to testify based on the status of the case at this time?

"The defendant: Yes, now I will not testify.

"[Defense counsel]: And you understand you have a right to testify no matter what I say, whether I think it's good or not good for [you to] testify, you could still testify. [¶] Do you understand that?

"The defendant: Yes.

"[Defense counsel]: And having that knowledge, what is your position?

"The defendant: Now I will not testify."

### b. *Defendant's Decision Not To Testify Was Knowing, Intelligent, and Voluntary*

A criminal defendant has the right to testify at trial, "a right that is the mirror image of the privilege against compelled self-incrimination and accordingly is of equal dignity." (*People v. Barnum* (2003) 29 Cal.4th 1210, 1223; see *People v. Nakahara* (2003) 30 Cal.4th 705, 717.) "The defendant may exercise the right to testify over the objection of, and contrary to the advice of, defense counsel. [Citations.] 'When the decision is whether to testify . . . at the guilt phase of a capital trial [citation] it is only in case of an express conflict arising between the defendant

and counsel that the defendant's desires must prevail. In the latter situation, there is no duty to admonish and secure an on the record waiver unless the conflict comes to the court's attention.'" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1332; see *People v. Enraca* (2012) 53 Cal.4th 735, 762.) Absent an express conflict, "'a trial judge may safely assume that a defendant, who is ably represented and who does not testify is merely exercising his Fifth Amendment privilege against self-incrimination and is abiding by his counsel's trial strategy . . . .'" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1053.)

Defendant argues that his decision to forgo testifying was not knowing, intelligent, and voluntary because he was misled to believe he could appeal the trial court's tentative ruling regarding the admissibility of uncharged crimes evidence even if he did not testify. (See discussion *post*.) He asserts he was misled by the court's comment, in expressing reluctance to issue a tentative ruling, that it may "create an issue on appeal." He also suggests that "defense counsel continued to make strenuous objections in an effort to preserve the issue for appeal," and counsel "simultaneously objecting to the trial court's ruling and advising [him] not to testify strongly suggested that he could challenge the issue in appellate proceedings." Defendant contends "neither the trial court nor defense counsel told him he was waiving his right to appeal the trial court's ruling on the unadjudicated offenses nor did they endeavor to ensure that [he] was not misled by the trial court's erroneous statements or trial counsel's efforts to preserve the issue for appeal. [His] waiver of a fundamental right made in the absence of any advice as to its consequences and the trial court's uncorrected misleading statement of law is invalid."

Initially, defendant acknowledges that a formal, in-court waiver of his right to testify was not required because there was no apparent conflict between defendant and his counsel as to whether he should take the stand. " '[A] trial judge may safely assume that a defendant, who is ably represented and who does not testify is merely exercising his Fifth Amendment privilege against self-incrimination and is abiding by his counsel's trial strategy . . . .' [Citation.] If that assumption is incorrect, defendant's remedy is not a personal waiver in open court, but a claim of ineffective assistance of counsel." (*People v. Bradford, supra,* 14 Cal.4th at p. 1053.) Defendant does not urge his counsel was ineffective, nor does he allege there was a conflict with counsel. Any claim of ineffective assistance based on evidence not in the trial record must be made in a habeas corpus petition. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.)

In any event, defendant's argument does not withstand scrutiny. Defendant's argument is based on his implicit suggestion that, had he understood he could not appeal the trial court's tentative ruling, he would have testified, presumably to preserve that issue for appeal. The record here belies defendant's suggestion that his decision not to testify turned on the appealability issue and thus was not knowing and voluntary. Although the court tentatively ruled defendant could be impeached with two uncharged incidents if he testified, the court also agreed to instruct on heat of passion as to Tram and accident as to the others. The latter ruling largely obviated the need for defendant to testify to establish the defense theory. Indeed, defense counsel cited the ruling as a circumstance supporting defendant's decision not to testify. At the same time, defense counsel did *not* mention the appealability of the court's

tentative impeachment ruling, which might have been expected had appealability been a determinative factor in defendant's decision as he now suggests. Further, the court's offhand comment explaining its reluctance to create an appellate issue was immediately corrected by the prosecutor without objection from defense counsel, with the prosecutor reminding everyone that defendant would have to testify to preserve any later claim. Defendant characterizes counsel's statements during the later colloquy as a continuing objection to the court's tentative ruling which served to further mislead him about the appealability of that ruling. What counsel intended by his comments is somewhat unclear, but, as noted, he never mentioned any right to appeal from the court's tentative ruling nor did he suggest he told his client that defendant could appeal the issue without testifying. This record supports the conclusion that defendant's decision not to testify was knowing, intelligent, and voluntary. (Cf. *People v. Sivongxxay* (2017) 3 Cal.5th 151, 164–169 [jury trial waiver].)

### 4. *Impeachment Ruling*

Defendant challenges the trial court's tentative ruling that, if he testified, he could be impeached with evidence of his participation in two uncharged robberies. "It is well established that the denial of a motion to exclude impeachment evidence is not reviewable on appeal if the defendant subsequently declines to testify." (*People v. Ledesma* (2006) 39 Cal.4th 641, 731; see *Luce v. United States* (1984) 469 U.S. 38, 41–43.) Defendant acknowledges this rule but argues it should not apply here because he reasonably relied on the court's misstatement that the issue was appealable even if he did not testify. (See discussion *ante*.) We reject the argument. For the reasons already discussed, the record belies defendant's suggestion that

his decision not to testify was induced by the court's misstatement of law. As noted, the court's statement was immediately corrected by the prosecutor without defense objection, and the appealability of the court's ruling was not mentioned during defense counsel's colloquy announcing defendant's decision not to testify. These circumstances present no compelling reason to deviate from settled jurisprudence that defendant must testify to preserve a challenge to the court's tentative ruling on impeachment. (See *Ledesma,* at p. 731; *People v. Sims* (1993) 5 Cal.4th 405, 455–456; see also *People v. Collins* (1986) 42 Cal.3d 378, 383–388 [adopting rule].)

### 5. *Exclusion of Defense Evidence*

#### a. *Defense Expert*

Defendant contends the trial court improperly excluded a defense expert.[12] No error appears.

##### i. *Background*

The defense witness list included Dr. David M. Posey. The prosecutor stated he had received Posey's report but had concerns about the form of some of the doctor's opinions. Posey concluded he "believes beyond a reasonable doubt that the shooting of Minh [Tram] was purposeful and intentional," while the shooting of the other three victims was "unintentional and accidental . . . beyond a reasonable doubt." The court expressed skepticism that "medicine has evolved to a scientific and medical

---

[12] Defendant claims a violation of his rights to present a defense, confront witnesses, due process, proof beyond a reasonable doubt, effective assistance of counsel, and non-arbitrary guilt and penalty determinations under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and their state counterparts.

certainty of whether a person's discharge of the firearm was accidental or intentional" and suggested an evidentiary hearing would be required. (See Evid. Code, § 402, subd. (b).)

At the hearing, the prosecutor asked Posey about an "incident scenario" he described in his report that Tram was shot "with a volley of several shots" and "then while an individual was attempting to disarm the perpetrator, a second volley of shots accidentally and unintentionally injured and killed three other victims." The court asked Posey to clarify the bases of his opinion. Posey explained that he considered his opinion "more of injury pattern analysis," and "the question posed to me could I render an opinion based on the wound patterns as to whether I felt it was intentional — wounds were intentionally placed or unintentionally placed." The court questioned whether "a wound in and of itself . . . can tell you whether the shot was intentional or unintentional" and inquired what experience or field of medicine allowed him to draw such conclusions. Posey stated he was a forensic pathologist and "[y]ou take a pattern of injuries or pattern of gunshot wounds and you work backwards through the scenario given the information I was provided." Posey explained that he could draw conclusions regarding intentionality "if you compare one victim to another victim to another victim to the fourth victim, that's where I was able to make a decision based on that. [¶] Seemingly the primary individual, Minh [Tram], had wounds that were very accurately, in my opinion, from a number of gunshot wound cases I have done, were purposefully placed. They were placed to kill. [¶] And as I reviewed the cases the one that jumped out at me was the young lady, I think it was Ms. Dang, who had really one gunshot wound that was an entrance in the left arm, exited the inner portion of the left arm and

reentered the chest and ended up going through vital organs. [¶] In my opinion if I am basing it on the whole scenario that becomes one that was not a purposeful shot. I don't think that shot was meant to kill her, based on again what I have seen of the scene from diagrams, the videos and everything like that."

There was some confusion about what Posey meant by "purposeful." He ultimately clarified he meant an intent to fire the gun and hit the target, not simply an intent to pull the trigger. The court observed that the jury had heard evidence about "the various wounds, the trajectory, the paths through organs that resulted in death" and asked Posey, "What is the difference in the evaluation and mental process of those jurors making that determination and you?" The question was directed to whether the subject was sufficiently beyond common experience that the opinion of an expert would assist the trier of fact. (Evid. Code, § 801, subd. (a).) Posey gave a lengthy answer: "Sir, it's a forensic opinion. . . . [W]hat the court has to understand there is a difference between a medical doctor's opinion and a medical forensic opinion. That's what I opined earlier, that we take everything, not just this [an examination of the bodies]. If that's all there was to it, I wouldn't even be sitting here talking to you. But because we are trained, and that's the essence of a lot of the training of forensic medicine . . . . It's reconstruction of injury patterns to try to put together in the mind's eye of the beholder, whoever that is, be it an attorney like yourself or an attorney, what exactly happened. People say what happened. I don't understand. Based on my experience, training, and everything I have done the last quarter of a century is what brings us together as a forensic specialist, not just as an M.D. sitting here with training in pathology." Posey clarified that "[y]ou take multiple pieces"

including "the medical information" and "the investigative information." The transcript continues:

> "[Posey]: Because Mr. Minh had three well-placed shots in his body, one the back of his head and two in the side. Again, I don't know if it happened all the same time. . . . These are well-placed shots. Anybody handling a firearm will know if you put a shot [in] the back of the head, the lights are out. If you put them in the chest, the chances are the guy isn't going to survive.

> "The Court: Are you suggesting anybody who shoots somebody in the chest didn't do so intentionally [in apparent reference to victim Dang's injury]?

> "[Posey]: I would think that one case by itself, if they shoot them in the chest, I would think they were thinking about ending the individual's life or at least stopping them from going forward. But when you relate this to the other three and you look at the wound pattern, that's what gave me the opinion, based on the other information I had from the investigative reports, that, yes, that could be a possibility that . . . these three victims weren't the intention of that crime that night, that this actually became more of a secondary accidental thing than it did as I did not, he did not, whoever the perpetrator, did start out to shoot these three people. That's how I came to my opinion, your honor."

Posey confirmed that he had not conducted any experiments "where shootings took place and tried to verify [his] opinions," nor was he aware of other pathologists who had done so.

The court ruled admission of Posey's opinion about defendant's intent would violate Penal Code section 29 (see discussion *post*), and "[i]t sure sounds like the doctor is invading the province of the jury that Penal Code section 29 specifically reserves to the trier of fact." The court clarified that Posey could "testify to any medical pattern or what have you, but what I am saying is an opinion as to whether the shooting was intentional, accidental, with malice or without malice is a province that he is not entitled to go into under this section." The court later added that it had "very strong reservations as to whether the procedure and process that form the basis of his opinion are something based in science and whether it is a recognized body of science that includes other individuals or similar background. [¶] The court is also concerned about the lack of any studies or attempts to verify the issues that are the subject matters of this opinion." Posey was not called to testify.

### ii. *The Trial Court Properly Excluded Opinion Testimony Regarding Defendant's Intent*

"While lay witnesses are allowed to testify only about matters within their personal knowledge (Evid. Code, § 702, subd. (a)), expert witnesses are given greater latitude. 'A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.' (Evid. Code, § 720, subd. (a).) An expert may express an opinion on 'a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (Evid. Code, § 801, subd. (a).)" (*People v. Sanchez* (2016) 63 Cal.4th

665, 675.) "The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

Defendant argues Posey's testimony was relevant to his defense that his shooting of the three victims other than Tram was accidental. He correctly observes that "[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.) He further contends that Penal Code section 29, relied on by the trial court, did not apply to him. That provision states: "In the guilt phase of a criminal action, *any expert testifying about a defendant's mental illness, mental disorder, or mental defect* shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." (*Ibid.*, italics added.) As defendant notes, Posey did not purport to testify regarding any mental illness or disorder of defendant.

Nevertheless, the trial court properly concluded that Posey's proposed opinion about defendant's state of mind should be excluded. "A consistent line of authority in California as well as other jurisdictions holds a witness cannot express an opinion concerning the guilt or innocence of the defendant. . . . [T]he reason for employing this rule is not because guilt is the 'ultimate issue of fact' to be decided by the jury. Opinion testimony often goes to the ultimate issue in the case. [Citation.]

Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." (*People v. Torres* (1995) 33 Cal.App.4th 37, 46–47.) Here, Posey's proposed testimony was "tantamount to expressing an opinion as to defendant's guilt" (*People v. Ward* (2005) 36 Cal.4th 186, 210) because it proposed to dispose of an essential element of the crime. In essence, Posey sought to testify that defendant was not guilty of three murders because defendant lacked the required intent. Posey opined that the wounds to the three victims other than Tram reflected that they were not "purposeful" but accidental. He acknowledged that his opinion was not based solely on any medical evaluation of the wounds but also on "investigative information," including evidence suggesting that Tram was defendant's primary target. Indeed, Posey conceded that if his opinion was limited to the medical evidence, he "wouldn't even be sitting here talking to you." As the trial court observed, the jury was equally equipped as Posey to evaluate whether the shooting of the other three victims was accidental or intentional. Posey's opinion "of the knowledge or intent of a defendant on trial" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1551) did not assist the trier of fact and the court did not abuse its discretion by excluding the testimony. (See *Torres*, at pp. 47–48.)

Defendant suggests Posey's testimony was necessary to rebut the testimony of prosecution firearms expert Patricia Fant. He argues Fant "opined that, based on her trajectory rod analysis, the shooter was aiming for or shooting for the victims' center mass or heads," and "[t]hus, Fant, based on her analysis of forensic evidence, was testifying as to the shooter's intent."

Defendant mischaracterizes Fant's testimony. Fant testified that the bullet trajectories were consistent with the shooter being positioned in front of the booth and firing at a slightly downward angle. Although Fant agreed with the prosecutor's statement that the shooter "was basically shooting center mass or head," she contrasted the trajectories with what might be expected if the shooter were aiming "at their arms or their feet or their legs." Fant testified as to the direction and angle at which the shots were fired. She did not purport to testify regarding the shooter's mental processes. She conceded on cross-examination that she did not know whether the bullets hit the table before entering the victims and acknowledged that an intervening object could have changed the bullet trajectory. Posey's proposed testimony would not have constituted valid rebuttal to Fant's testimony.

b. *Evidence Regarding the International Club's Business License*

Defendant contends the trial court improperly excluded evidence that the City of El Monte tried to rescind the International Club's business license after the shooting.[13] The court did not err.

i. *Background*

Before trial, defense counsel proposed to present evidence from witnesses who "testified at a hearing and provided reports regarding International Club and efforts to close it down, prior incidents that had occurred there, why there was supposed to be increased security." Counsel argued the evidence was relevant to the credibility of John Bui, the club's owner. The court

---

[13] See footnote 12, *ante*, at page 26, as to the errors asserted.

conducted a hearing.  (Evid. Code, § 402, subd. (b).)  El Monte Police Officer Gary Haidet testified that, after the murders, he was asked to review police dispatches to the club to determine whether its business license should be renewed.  Between November 1996 and this incident, there were 51 radio calls for police assistance at the club.  Six calls involved guns or shootings.  Haidet recommended that the club's license not be renewed based on several factors:  increased gang activity; concerns regarding security and underage patrons; and its remote location, which hampered police response.  Further, the club's metal detector had not worked "for quite a while," including the night of the shooting.  The club's business license expressly required the use of security guards and metal detectors.  Los Angeles County Sheriff's Sergeant William Howell testified that, although the club was known as an Asian gang hangout, he had no information that Bui was associated with any gang.

Defense counsel argued this evidence was relevant to Bui's credibility because it showed he failed to follow the requirements of the club's license, particularly for adequate security.  The court sustained the prosecutor's hearsay and relevance objections without prejudice to a renewed request at trial.  After Bui's trial testimony, defense counsel asked "to bring in evidence of the fact that that location is a gang hangout and information having to do with Mr. Bui being involved as a security person."  The court denied the request, noting that Bui expressly denied being in charge of security and questioning the relevance of the evidence on Bui's credibility.

## ii. *The Trial Court Properly Excluded the Evidence*

Defendant here provides a laundry list of reasons why this evidence was relevant. He argues the evidence impeached Bui's credibility by refuting his claim that he was not responsible for security and suggesting he had a motive to lie because his business license was imperiled. These claims lack merit. On the first point, although Bui may have been "responsible" for security in the sense that he was a co-owner of the club, this fact was not inconsistent with Bui's testimony that his partner handled the day-to-day security of the club. As to credibility, defendant does not explain how Bui's allegedly false testimony about the shooting would have aided renewal of his business license. It was the *fact* of the shooting, not its particulars, that prompted the investigation. No evidence was offered to suggest that Bui was told of the license review or that he was otherwise aware of it.

Defendant's remaining arguments conflate the business license investigation with general evidence that the club was patronized by gang members. Defendant contends the evidence would have (1) impeached Bui's testimony that he was not aware the club was a gang hangout, (2) shown Bui was "financially beholden" to gangs because of their patronage, (3) refuted the prosecutor's suggestion that Bui was a victim who ran a "clean" business, and (4) bolstered the reasonableness of his own conduct by explaining the "gang dynamics" at the club. However, the court did not preclude evidence of gang conduct at the club generally. Defense counsel made clear he sought evidence of the license investigation to impeach Bui. He did not offer broader evidence as to gang attendance or activity there. Exclusion of this irrelevant evidence did not undermine

defendant's right to present a defense. (See *People v. Thornton* (2007) 41 Cal.4th 391, 445.)

### 6. *Defendant's Gang Affiliation*

Defendant contends the court erred by denying his pretrial motion to exclude evidence of his gang membership.[14] The prosecutor argued before the trial court that the gang evidence "explains some of the interrelationships between the people and it also goes to motive." Defense counsel countered that evidence of his gang membership was irrelevant because "[t]here are no gang allegations filed," though counsel conceded "[t]here can be reference to the location being a gang location and that type testimony." The prosecutor responded that "we can't refer to this place as a gang hangout, refer to some of the victims as gang members, but then completely sanitize Mr. Duong." The prosecutor argued a gang enhancement allegation was not necessary to present evidence of defendant's membership if it was otherwise relevant to explain the shooting. The court ruled the evidence was relevant to motive and Bui's reluctance to testify, and concluded the probative value was not substantially outweighed by the probability of undue prejudice. (See Evid. Code, § 352.) The court later gave a limiting instruction that defendant's gang membership could only be considered as to identity or motive.

Defendant argues here that his gang membership was irrelevant because no gang enhancement allegation was filed, and the identity of the shooter was not at issue. Initially, it was

---

[14] Defendant claims a violation of his federal and state constitutional rights to due process, a fair trial, an impartial jury, reliable guilt and penalty determinations, freedom of association, and proof beyond a reasonable doubt.

*not* clear before trial that the defense would concede identity. One witness, Hoa Truong, told a defense investigator defendant could not have been the shooter because defendant ran from the club during the incident. Truong later renounced that statement at trial.

In any event, as the court below reasoned, there was little question that evidence of defendant's gang membership was relevant to motive. Indeed, *without* such evidence, the shooting would have been difficult to explain. There was conflicting evidence about whether defendant was involved in the preceding argument, and there was no evidence he had any prior relationship to Tram.

The gang affiliation evidence gave context to the shooting, as well as the destruction of evidence afterwards. Defendant, a member of Lao Family, was at the club with other Lao Family members, including Anthony Tran. He sat at a table with members of other friendly gangs, including the Wah Ching and Pomona Boys. Khiet Diep, a Wah Ching member who sat at defendant's table, was later seen destroying surveillance video. Thi Van Le identified Tran as being involved in the argument in the restroom and that victim Minh Tram joined the argument. Bui told police he saw Tram having a "heated discussion" with someone as he left the restroom, then saw defendant and Tram leave the restroom together. Bui confirmed that defendant's group and Tram's group were both involved in the restroom altercation. Diep also told police that defendant was involved in the argument. Defendant was subsequently heard to ask Diep whether he wanted defendant to "do him now." Tram and a companion were members of the Black Dragon gang. Neither defendant nor others with him were associated with that gang.

"In general, '[t]he People are entitled to "introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent." [Citation.]' [Citation.] '[E]ven where gang membership is relevant,' however, 'because it may have a highly inflammatory impact on the jury trial courts should carefully scrutinize such evidence before admitting it.' [Citations.] On the other hand, ' "[b]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." [Citations.]' [Citation.] On appeal, we review for abuse of discretion a trial court's ruling on whether evidence is relevant, not unduly prejudicial, and thus admissible." (*People v. McKinnon* (2011) 52 Cal.4th 610, 655.) No abuse of discretion appears on this record. The gang evidence explained defendant's willingness to shoot a complete stranger minutes after a verbal spat, along with the apparent coordination among defendant's associates to destroy the surveillance tape. Of course, other motivations could have been at play. Defendant may have acted in the heat of passion, as the defense argued at trial. But the possibility of other motivations did not preclude the prosecution from presenting evidence that gang affiliation was the precipitating factor. (See *ibid*.; see also *People v. Montes* (2014) 58 Cal.4th 809, 859–860; *People v. Carter* (2003) 30 Cal.4th 1166, 1194–1196.)

The probative value was not substantially outweighed by the probability of undue prejudice. (Evid. Code, § 352.) The gang evidence was largely limited to testimony regarding various people's affiliations. Two witnesses testified defendant had an "LF" tattoo. No gang expert testified, and there was no evidence of any other gang-related activity other than this

shooting. The court properly admonished the jury that gang evidence was only relevant as to identity or motive and did not reflect on defendant's character. (*People v. Valdez* (2012) 55 Cal.4th 82, 134.)

### 7. *Instructional Error Claims*

#### a. *CALJIC No. 2.83*

Defendant contends[15] the trial court should have granted his request to give CALJIC No. 2.83: "In resolving any conflict that may exist in the testimony of expert witnesses, you should weigh the opinion of one expert against that of another. In doing this, you should consider the qualifications and believability of each witness, the reasons for each opinion and the matter upon which it is based." (See also CALCRIM No. 332.) Although acknowledging that the defense called no experts, counsel argued the instruction was necessary for the jury to distinguish among the prosecution experts, claiming "they may have had testimony which was not entirely consistent with one another." The court declined to give the instruction, concluding "[t]here doesn't appear to be competing opinions on similar subject matters."

Contrary to defendant's contention, there was no "materially conflicting testimony on similar subject matters" among the prosecution experts. He alleges two instances. First, he claims, "Fant testified that the angle of some of the shots may have been altered *because* they passed through something. [Citation.] In contrast, pathologist Lisa Scheinin was skeptical

---

[15] Defendant claims he was deprived of his right to due process "and other rights" protected by the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and their state counterparts.

that any of the bullets passed through another person or object before hitting the victims." (Italics added.) As the People observe, defendant mischaracterizes the testimony. In reference to some of the trajectory rods in the booth where the shooting occurred, the prosecutor inquired whether "some of the shots appear to have been fired almost straight on into the booth where some appear to have been fired from an angle into the booth." Fant responded that "[s]ometimes the angle, because we don't have everything exactly the way it was, once the bullet goes through something it could change trajectory," but that "all I can say is the person was standing in front and firing from the seating area back towards where . . . [t]he walkway is." Fant did not testify the bullets *did* pass through something before striking a victim. Her testimony was not inconsistent with Dr. Scheinin's during cross-examination refuting defense counsel's suggestion that the bullets could have ricocheted off of the table into the victims. Fant was discussing a bullet changing trajectory *after* entering a victim's body, whereas Scheinin was addressing whether a bullet could have ricocheted *before* hitting the victims.

The second alleged conflict involved testimony about the ease of firing a weapon under certain circumstances: "Firearms examiner Mike Oto testified that generally, once the slide or safety is off on a gun, it is easier to pull the trigger. [Citation.] On the other hand, firearms expert Manuel Munoz testified that it becomes no easier to pull the trigger after the safety is off and an initial shot is fired. [Citation.] Patricia Fant testified that to her knowledge, it was possible for a semi-automatic weapon to discharge at least two bullets accidentally." These experts were discussing different aspects of the process. Oto agreed with defense counsel on cross-examination that pulling back the

slide and taking the safety off would make a gun "easier to shoot" by placing it in a "shooting position." By contrast, Munoz was testifying about the pounds of force required to pull the trigger itself, and that each successive shot did not become easier in that sense. It is unclear how either Oto's or Munoz's testimony conflicted with Fant's testimony that two bullets were "[t]he most" she had heard of having been expelled during an accidental discharge.

On this record, the defense request "was properly refused on the ground that no conflicting expert testimony was presented." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1161.) It should be noted that the court gave CALJIC No. 2.80, which told jurors they should "consider the qualifications and believability of the witness, the facts or materials upon which each opinion is based, and the reasons for each opinion," as well as whether any fact relied upon "has not been proved, or has been disproved," and "the strengths and weaknesses of the reasons" upon which their opinions are based. The court also gave CALJIC No. 2.82 addressing hypothetical questions. The jury was adequately instructed.

### b. *Lying in Wait*

Defendant contends no substantial evidence warranted instructing the jury as to murder by lying in wait.[16] Alternatively, he argues the instruction regarding the theory[17]

---

[16] Defendant claims a violation of his rights to a fair trial and due process under the Sixth and Fourteenth Amendments to the federal Constitution and their state counterparts.

[17] We address only lying in wait as a theory of first degree murder as the jury was not instructed on the lying in wait special circumstance. (Pen. Code, § 190.2, subd. (a)(15).)

was defective. We reject these claims. "To prove lying in wait, the prosecution must prove there was a concealment of purpose, a substantial period of watching and waiting for a favorable or opportune time to act, and that immediately thereafter the defendant launched a surprise attack on an unsuspecting victim from a position of advantage." (*People v. Gurule* (2002) 28 Cal.4th 557, 630; see *People v. Russell* (2010) 50 Cal.4th 1228, 1244 (*Russell*).)

We reject defendant's argument that no evidence showed concealment of purpose. "With regard to the element of concealment, we have explained that physical concealment before the attack on the victim is not required. Rather, ' "[i]t is sufficient that a defendant's true intent and purpose were concealed by his actions or conduct." ' [Citation.] The concealment, in that sense, ' "is that which puts the defendant in a position of advantage, from which the factfinder can infer that lying-in-wait was part of the defendant's plan to take the victim by surprise." ' " (*People v. Johnson* (2016) 62 Cal.4th 600, 631–632.) Defendant did not shoot Tram immediately after the verbal altercation. Following the argument, defendant sat with Diep and asked if Diep wanted him to "do him now." About 10 to 15 minutes after the argument, defendant approached the booth from behind and started shooting as he neared the front of it. Tram did not draw his own gun before being hit, suggesting he was surprised by the attack. Defendant waited to attack until Tram was seated in the booth, a position of disadvantage. There was sufficient evidence of concealed purpose. (See *ibid.*; *Russell, supra,* 50 Cal.4th at p. 1245.)

Defendant acknowledges that he did not shoot Tram immediately after the argument but suggests there was no evidence of a substantial period of watching and waiting because

Tram provoked him during their verbal altercation and "the provocation continued and escalated until the first shots were fired." This contention misses the mark. The jury was fully instructed on provocation and could have returned a voluntary manslaughter verdict as to Tram under a heat of passion theory. Of course, the jury was not obligated to accept the defense theory, and the existence of some evidence warranting an instruction on that theory did not preclude an instruction on lying in wait where, as here, there existed substantial evidence of a concealed purpose.

Defendant alternatively contends CALJIC No. 8.25, given here, was inadequate in two respects. First, it failed to inform jurors that lying in wait did not apply if defendant "acted in anger, in response to provocation." Second, the instruction did not tell the jury the period of watching and waiting must be "for a substantial period of time."

These claims lack merit. "We have repeatedly held that CALJIC No. 8.25 adequately conveys to a jury the elements of lying-in-wait murder." (*Russell, supra,* 50 Cal.4th at p. 1244; *People v. Ceja* (1993) 4 Cal.4th 1134, 1139.) On the first point, the court gave CALJIC No. 8.42 dealing with heat of passion voluntary manslaughter. Heat of passion requires that "the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from passion rather than from judgment." (*Ibid.*) The court also gave CALJIC No. 8.50, which explained that "[w]hen the act causing the death, though unlawful, is done in the heat of passion or is excited by a sudden quarrel that amounts to adequate provocation, the offense is manslaughter. In that case, even if an intent to kill exists, the law is that

42

malice, which is an essential element of murder, is absent." By contrast, the court instructed jurors that murder required malice aforethought (see CALJIC Nos. 8.10, 8.11), and lying-in-wait first degree murder required a period of waiting "such as to show a state of mind equivalent to premeditation or deliberation" (CALJIC No. 8.25). Considered as a whole, these instructions adequately told the jury that, if it found defendant killed the victims under legally adequate provocation, he could not be found guilty of first degree murder. If defendant wanted a more direct statement to that effect based on the particular facts here, it was incumbent upon him to request such an instruction. (Cf. *People v. Rogers* (2006) 39 Cal.4th 826, 878–880 [instruction on provocation reducing degree of murder is a pinpoint instruction].)

We have previously rejected defendant's second argument. "Defendant next contends the instructions do not require a 'substantial' period of waiting and watching. Again, the specific word 'substantial' was not used. However, the jury was told that the lying in wait must be of sufficient duration to establish the elements of waiting, watching and concealment or other secret design to take the victim unawares and by surprise, and that a murder done suddenly without such waiting, watching and concealment is not murder by lying in wait. These requirements necessarily include a substantial temporal element. We have never required a certain minimum period of time, only a period not insubstantial. The instructions sufficiently convey this meaning." (*People v. Edwards* (1991) 54 Cal.3d 787, 823; see *Russell, supra,* 50 Cal.4th at pp. 1244–1245.)

B. *Penalty Phase Issues*

1. *Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct during penalty phase argument.[18] "Prosecutorial misbehavior 'violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*People v. Rhoades* (2019) 8 Cal.5th 393, 418.) Under state law, a prosecutor's action that does not cause fundamental unfairness is prosecutorial misconduct only if it involves " ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*Ibid.*) We reject defendant's assertions of misconduct.

Defendant asserts the prosecutor improperly suggested that choosing a sentence of life without the possibility of parole would be the "easy way out" and "if you take an easy way out, I suggest that at some point in time, some day when you look yourself in the mirror, you will know in your heart you did the wrong thing." Defendant mischaracterizes the prosecutor's argument. He was not suggesting that any verdict of life without parole would constitute the "easy way out." Rather, he was urging that jurors *who came to the conclusion that death was the appropriate judgment* should not vote for life without parole simply because a death verdict was more difficult. The prosecutor said after the statement quoted above: "In life there's tough decisions that sometimes have to be made. And if we

---

[18] Defendant claims he was denied his rights to a fair trial, due process, and a reliable penalty determination in violation of the Fifth, Sixth, Eighth, and Eleventh Amendments to the federal Constitution and their state counterparts.

make those decisions honestly, we make the tough decisions, we don't take the easy way out.  I dare say, ladies and gentlemen, if you follow the evidence in this case, if you follow the evidence, there's but one conclusion to come to.  And that's not an easy conclusion.  But if you come to it, you will always be able to look yourself in the mirror and say, you know what, I got summoned into court, it's something I would have rather not have done, it was a very difficult decision, one I may think about daily for the rest of my life.  But I know this, I know that I made the decision that was the right decision to make."  We have previously noted that it is "proper for the prosecutor to argue that determining the appropriate punishment in a capital case is a difficult decision that requires courage."  (*People v. Jones* (1997) 15 Cal.4th 119, 185, overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)  The prosecutor's comments here were in the same vein.

Defendant next argues the prosecutor improperly suggested defendant would be a "shark" in prison if the jury spared his life.  Defendant contends future dangerousness in prison is not an aggravating factor and should not have been argued.  Initially, "the prosecutor may not present *expert evidence* of future dangerousness as an aggravating factor, but he may argue from the defendant's past conduct, as indicated in the record, that the defendant will be a danger in prison."  (*People v. Zambrano, supra,* 41 Cal.4th at p. 1179, italics added; see *People v. Tully* (2012) 54 Cal.4th 952, 1054.)  The prosecutor's arguments were based, not on expert opinion, but on the circumstances of the present case and defendant's conduct during the other uncharged robberies and murders.  The prosecutor first argued that, even if jurors could "feel safe knowing you took Mr. Duong out of society," "that's not the

question we're here to address. We're here to address what is the appropriate punishment for Mr. Duong's conduct in this case." In this context, the prosecutor stated: "Sometimes jurors are told that life imprisonment without the possibility of parole is like being on a boat alone in the middle of an ocean surrounded by sharks. The analogy being that a defendant serving life in prison without the possibility of parole is basically in a jail cell and the prison is the ocean and the other inmates are the sharks. Again, that is not what you're here to decide. You're here to decide what is the appropriate punishment. [¶] And also you might well say that based on the evidence presented Mr. Duong is the shark. And I don't say that to arouse hatred or malice towards Mr. Duong. That's not the point, but I'm going to be very candid in my remarks concerning his conduct." This comment dovetailed into a discussion about defendant's conduct during the other robbery incidents and how he manipulated his girlfriend to do his bidding. The prosecutor argued: "Is that the conduct of a man that in any way will ever, ever be anything but a threat to other people? Do you think just because he has LWOP that his conduct will ever change, that he will not be a danger?" As this argument was "based on the evidence presented" (*People v. Boyette* (2002) 29 Cal.4th 381, 446), there was no misconduct. (See *People v. Freeman* (1994) 8 Cal.4th 450, 521.)

Defendant contends the prosecutor improperly argued defendant lacked remorse for the killings. He further suggests the prosecutor misrepresented the facts on this point by not presenting evidence of defendant's suicide attempt while incarcerated or his comments before the penalty phase that he wanted to "accept the D. P. instead of going through this." Defendant points to two comments by the prosecutor that

defendant "has not shown one tear drop of remorse" and he "took the life of each of those individuals without one shred of remorse or mercy." "[L]ack of remorse, because it suggests the absence of a mitigating factor, is deemed a relevant factor in the jury's determination as to whether the factors in aggravation outweigh those in mitigation, and is thus an appropriate subject of comment by the prosecutor, so long as he or she does not argue that lack of remorse constitutes a factor in aggravation." (*People v. Crittenden* (1994) 9 Cal.4th 83, 150; see *People v. Spencer* (2018) 5 Cal.5th 642, 687.) The prosecutor could reasonably argue, based on defendant's conduct, the absence of remorse as a mitigating circumstance. If defendant believed other evidence tended to rebut such an argument, he was free to present it. That he chose not to do so did not render the prosecutor's comments misleading.

Finally, defendant complains that the prosecutor should not have been allowed to read a passage from the book The Killing of Bonnie Garland.[19] Defendant acknowledges that we

---

[19] As read to the jury here, the passage stated: "When one person kills another there is an immediate revulsion in the nature of the crime. But in time so short as to seem indecent to the members of the personal family, the dead person ceases to exist as an identifiable figure. To those individuals in the community of good will and sympathy and empathy, warmth and compassion, only one of the key actors in the drama remains with whom to commiserate, and that is always the criminal. The dead person ceases to be a part of everyday reality, ceases to exist. The victim is only a figure in a historic event. And we inevitably turn away from the past toward the ongoing reality of everyday life. And the ongoing reality is that the criminal, trapped, anxious, now helpless, isolated, perhaps badgered, perhaps bewildered, is all that's left. He takes away compassion

have repeatedly rejected that argument, explaining, "in determining penalty, [the jury] was required to consider not only the criminal but also his crime." (*People v. Rowland* (1992) 4 Cal.4th 238, 277–278; see *People v. Cook* (2006) 39 Cal.4th 566, 612–613; *People v. Gurule, supra*, 28 Cal.4th at p. 659; *People v. Hines* (1997) 15 Cal.4th 997, 1063.) Contrary to defendant's assertion, nothing in the prosecutor's argument suggested jurors should "compare the victims in this case to Bonnie Garland." The prosecutor argued defendant was not deserving of mercy or leniency, and "arguing to the jury the mere idea or belief that criminals sometimes get undeserved sympathy at the expense of their victims was proper." (*Gurule*, at p. 659.)

### 2. *Victim Impact Evidence*

Defendant challenges several aspects of the victim impact testimony.[20] "The Eighth Amendment does not categorically bar victim impact evidence. [Citation.] To the contrary, witnesses are permitted to share with jurors the harm that a capital crime caused in their lives." (*People v. Perez* (2018) 4 Cal.5th 421, 461–462.) "That is because 'the effects of a capital crime are relevant . . . as a circumstance of the crime.' [Citations.] And so long as victim impact evidence does not invite the jury to respond in a

---

that is justly the victim's. And he will steal away his victim's moral constituency along with the victim's life."

[20] Defendant claims a violation of the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and their state counterparts, depriving him of his rights to due process, a fair trial, a reliable penalty determination, and other unspecified rights.

purely irrational way, it is admissible." (*People v. Mendez* (2019) 7 Cal.5th 680, 712.)

Defendant first argues one of the victim impact witnesses gave improper opinion testimony. Mach Dang testified about the impact of his daughter's murder. He said he and his wife had been "suffering" and unable to sleep, his wife was sick, and he was "having a chest pain all the time." His daughter had wanted to be a teacher. After the prosecutor thanked him for his brief testimony,[21] he stated: "Sir, I first of all I thank you God for getting this defendant here because he is not able to kill another person." Defense counsel objected, the witness left the stand, and the parties moved on to the next witness.

Although "[i]t is improper for the victim's family to express their opinion regarding the proper verdict" (*People v. Collins* (2010) 49 Cal.4th 175, 229), that is hardly what occurred here. The witness was not asked what verdict he believed the jury should render. To the extent the witness was expressing that defendant's conviction gave him some closure, the testimony was not improper. (See *People v. Mills* (2010) 48 Cal.4th 158, 212–213.) Defendant could have asked that the comment be stricken and the jury admonished. He did not do so. (See *Collins*, at p. 229.)

Defendant complains the court should not have allowed "victim impact" testimony regarding two of the uncharged robberies. Michael Jeng testified that he worked at Wintec Industries when defendant killed his coworker Hsu Pin Tsai during a robbery attempt. Jeng described how, *at the time of the*

---

[21] Mach Dang's testimony spanned two reporter's transcript pages.

*shooting*, Tsai was disabled and wore a leg brace. He also testified that Tsai's wife worked at the company but was not present during the incident. Rafael Gomez testified he was working as a security guard at Traditional Jewelers when defendant shot him during a robbery attempt. Gomez had four surgeries as a result of the shooting, been unable to return to work, and required two more surgeries.

Initially, it seems questionable that this testimony constituted victim impact evidence at all, which is traditionally defined as "evidence about the victim and about the impact of the murder on the victim's family." (*Payne v. Tennessee* (1991) 501 U.S. 808, 827; *People v. Simon* (2016) 1 Cal.5th 98, 138.) The testimony in question only described the circumstances of the shootings and their direct aftermath. They did not encompass biographical information about Tsai or Gomez or any impacts the crimes had on their families. Even if this testimony did constitute victim impact evidence, "[t]he circumstances of uncharged violent criminal conduct, including its impact on the victims of that conduct, are admissible under [Penal Code] section 190.3, factor (b)." (*People v. Brady* (2010) 50 Cal.4th 547, 581–582.) The evidence was "relevant to the jury's penalty determination and its admission did not render defendant's trial constitutionally unfair." (*People v. Adams* (2014) 60 Cal.4th 541, 573.)

We also reject defendant's assertion that this testimony's probative value was substantially outweighed by the probability of undue prejudice. (Evid. Code, § 352.) The testimony was both highly probative and tended to rebut the defense suggestion that the present shooting resulted from a combination of provocation and accident. The witnesses did not recount any psychological impacts of defendant's crimes, and their descriptions of the

physical injuries were not inflammatory.  (See *People v. Brady, supra,* 50 Cal.4th at p. 582.)

Defendant claims he was given inadequate notice that the prosecution would present victim impact evidence regarding the uncharged offenses.  He asserts the prosecutor "misinform[ed]" him that victim impact evidence would be limited to victims Dang and Norman.  Defendant's claim rests entirely on the use of the label "victim impact evidence."  Before trial, the prosecution filed a notice of intent to introduce aggravating evidence at the penalty phase, listing eight uncharged incidents and victim impact testimony as to all four victims here.  After the jury's guilt phase verdict, the court inquired whether defense counsel had conferred with the prosecutor regarding "the specific evidence in aggravation" and if there was "any more need to address what the People's intention is."  Defense counsel responded that he believed "this issue was addressed back in September of last year" and he understood the prosecution would present evidence of "[t]he four aggravating incidents, plus two victim statements."  Counsel was fully aware of the prosecution's intent to present evidence as to the uncharged offenses.

### 3. *Constitutionality of the Death Penalty Statute*

Defendant raises numerous familiar challenges to the constitutionality of California's death penalty scheme.  Although recognizing we have previously rejected all of these arguments, he renews them to urge reconsideration and preserve the issues for federal review.  We decline to reconsider our settled precedent and continue to hold the following:

The category of death-eligible defendants under Penal Code section 190.2 is not unconstitutionally overbroad.  (*People*

*v. Winbush* (2017) 2 Cal.5th 402, 488 (*Winbush*); see *People v. Reed* (2018) 4 Cal.5th 989, 1018.)  Penal Code section 190.3, factor (a), allowing aggravation based on the circumstances of the crime, does not result in arbitrary and capricious sentencing.  (*People v. Thompson* (2016) 1 Cal.5th 1043, 1129; see *People v. Salazar* (2016) 63 Cal.4th 214, 255 (*Salazar*).)  The death penalty scheme is not unconstitutional for failing to require written findings (*Winbush*, at p. 490), unanimous findings (*People v. Wall* (2017) 3 Cal.5th 1048, 1072 (*Wall*)), or findings beyond a reasonable doubt as to the existence of aggravating factors, that aggravating factors outweigh mitigating factors, or that death is the appropriate penalty. (*Winbush*, at p. 489; *People v. Rangel* (2016) 62 Cal.4th 1192, 1235.)  These conclusions are not altered by *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, or *Hurst v. Florida* (2016) 577 U.S. __ [136 S.Ct. 616].  (*People v. Henriquez* (2017) 4 Cal.5th 1, 45 (*Henriquez*).)  The prosecution is not constitutionally obligated to bear a burden of proof or persuasion in sentencing, which is "an inherently moral and normative function, and not a factual one amenable to burden of proof calculations." (*Winbush*, at p. 489.)  For similar reasons, we have held the jury need not be instructed on a standard of proof for mitigating evidence.  (*People v. Capers* (2019) 7 Cal.5th 989, 1016; *People v. Jackson* (2016) 1 Cal.5th 269, 373.)  The federal Constitution also does not require an instruction that life is the presumptive penalty.  (*Wall*, at p. 1072; *Salazar*, at p. 256.)

CALJIC No. 8.88 is not defective for failing to require a determination that death is the "appropriate" penalty (see *Salazar*, *supra*, 63 Cal.4th at p. 256; *People v. Boyce* (2014) 59 Cal.4th 672, 724) or failing to require a life sentence if the jury

finds that mitigating factors outweigh aggravating ones (*People v. Johnson* (2018) 6 Cal.5th 541, 594; *People v. Moon* (2005) 37 Cal.4th 1, 42). This instruction's use of the phrase "so substantial" was not overbroad or unconstitutionally vague. (*Wall, supra,* 3 Cal.5th at p. 1073; *Salazar,* at p. 256.) CALJIC No. 8.85's use of the words "extreme" and "substantial" to describe mitigating circumstances does not impermissibly limit the jury's consideration of mitigating factors. (*Rices, supra,* 4 Cal.5th at p. 94; *Wall,* at p. 1073.) The court was not constitutionally obligated to delete inapplicable sentencing factors, designate which factors are aggravating or mitigating, or instruct that certain factors are relevant only in mitigation. (*Winbush, supra,* 2 Cal.5th at p. 490; *People v. Cook, supra,* 39 Cal.4th at p. 618.) "The trial court is not required to instruct the jury that the absence of a mitigating factor cannot be considered as an aggravating factor." (*People v. McKinnon, supra,* 52 Cal.4th at p. 692; see *Salazar,* at p. 256.)

The federal Constitution does not require intercase proportionality review. (*People v. Johnson, supra,* 6 Cal.5th at p. 594; *Winbush, supra,* 2 Cal.5th at p. 490.) Nor does the death penalty statute violate equal protection by providing different procedural safeguards to capital and noncapital defendants. (*Johnson,* at p. 594; *Henriquez, supra,* 4 Cal.5th at p. 46.) Finally, we have repeatedly held that California's capital sentencing scheme does not violate international norms or evolving standards of decency in violation of the Eighth and Fourteenth Amendments. (*Henriquez,* at p. 47; *Winbush,* at p. 490; *People v. Boyce, supra,* 59 Cal.4th at p. 725.)

## C. *Cumulative Error Claim*

Defendant contends cumulative error deprived him of a fair trial. "We have found no error, and where we assumed error, we have found no prejudice. Nor do we discern cumulative prejudice." (*People v. Edwards* (2013) 57 Cal.4th 658, 767; see *People v. Bell* (2019) 7 Cal.5th 70, 132; *People v. Westerfield* (2019) 6 Cal.5th 632, 728.)

## III. DISPOSITION

The judgment is affirmed.


**CORRIGAN, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Duong

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S114228
**Date Filed:**  August 10, 2020

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Robert M. Martinez

_____

**Counsel:**

Debra S. Sabah Press and Charles J. Press, under appointments by the Supreme Court, for Defendant and Appellant.

Kamala Harris and Xavier Becerra, Attorneys General, Lance E. Winters, Assistant Attorney General, Joseph P. Lee and Jonathan M. Krauss, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Debra S. Sabah Press
Attorney at Law
3571 Far West Boulevard, PMB 140
Austin, TX 78731
(512) 215-8964

Jonathan M. Krauss
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, Ca 90013
(213) 269-6123