Filed 3/9/22  P. v. Rebosio CA4/2
Opinion following rehearing

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074494 |
| v. | (Super. Ct. Nos. FVI18002727 & FVI18002728) |
| DOMINIC DANIEL REBOSIO, et al., | |
| Defendants and Appellants. | OPINION |

APPEAL from the Superior Court of San Bernardino County.  Eric M. Nakata, Judge.  Affirmed with directions.

Daniel J. Kessler, under appointment by the Court of Appeal, for Defendant and Appellant, Dominic Daniel Rebosio.

Scott S. Furstman, for Defendant and Appellant, Robert Gysbert DeJager, Jr.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Donald W. Ostertag and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

1

I.

INTRODUCTION

Defendant and appellant, Dominic Daniel Rebosio caused a fatal automobile accident. Codefendant Robert Gybsbert DeJager, Jr. assisted Rebosio in fleeing from the accident scene. Rebosio and DeJager (defendants) were tried together but separately appeal the judgment. They join in each other's arguments on appeal, to the extent they apply.

Rebosio appeals from judgment entered following jury convictions for gross vehicular manslaughter (Pen. Code, § 192, subd. (c)(1); count 1) and hit and run resulting in death (Veh. Code, § 20001, subd. (b)(2); count 2). In a bifurcated trial, the jury also found true allegations that Rebosio had a prior conviction for a serious felony (Pen. Code, § 667, subd (a)(1)) and a prior strike conviction (Pen. Code, §§ 667 & 1170.12). The court sentenced Rebosio to 19 years in prison.

Rebosio contends the trial court erred in allowing expert testimony that he violated the Vehicle Code and drove negligently, in disregard for the safety of others. Rebosio further argues that the jury instruction on gross vehicular manslaughter was inadequate because it did not instruct on all of the elements of the underlying speeding infraction. In addition, Rebosio argues the trial court violated his constitutional right to due process by giving CALCRIM No. 315 on eyewitness identification evidence.

DeJager appeals his conviction for hit and run resulting in death, as an aider and abettor (Veh. Code, § 20001, subd. (b)(2); count 2). The trial court sentenced him to

2

three years in prison. DeJager contends there was insufficient evidence to support his hit and run conviction. He further argues that the trial court abused its discretion in allowing evidence that (1) Rebosio stole the black Mustang he was driving during the accident, and (2) a Las Vegas police officer pulled over DeJager in his grey Mustang about two hours after the accident. Both defendants also argue there was cumulative error.

After we issued a decision in this case affirming the judgment, Rebosio filed a petition for rehearing, raising a new sentencing issue regarding applying Senate Bill No. 567 (2021-2022 Reg. Sess.) (hereinafter "S.B. 567") to his sentence. We granted the rehearing petition, vacated our decision, and permitted the parties to submit supplemental briefing regarding the impact of S.B. 567 on Rebosio's sentence. Rebosio contends that because the facts underlying the trial court's decision to impose an upper term sentence on count 1 were not stipulated to by Rebosio or found true beyond a reasonable doubt by a jury or bench trial, his sentence should be vacated. We agree.

We therefore reject defendants' contentions, with the exception that we agree S.B. 567 requires vacating Rebosio's sentence and remanding the case for resentencing Rebosio consistent with S.B. 567. In all other respects, the judgment is affirmed as to both Rebosio and DeJager.

II.

FACTS

In September 2018, R.D. posted on Craig's List an advertisement offering to sell his black Mustang. Rebosio responded and arrangements were made for him to test drive

3

the car.  When Rebosio test drove the black Mustang on September 7, 2018, he disappeared with the car.  R.D. reported the car stolen.

On September 15, 2018, at 12:38 a.m., Rebosio and DeJager stopped at an am pm Minimart in Boron, California.  Footage from the minimart's surveillance camera shows Rebosio at the gas pumps, exiting the stolen black Mustang.  The camera footage also shows DeJager getting out of a grey Mustang at the gas pumps, and Rebosio and DeJager entering the minimart together.  The camera footage ends with the black Mustang and grey Mustang driving away and entering State Route 58 (SR-58), eastbound.

E.B. testified that about 1:00 a.m. on September 15, 2018, he was driving a tractor-trailer eastbound on SR-58.  As he entered the construction zone, the highway narrowed to two lanes, with one lane in each direction and a double yellow line dividing the eastbound and westbound lanes.  When E.B. looked in his rear view mirror, he saw a black Mustang approaching, driving "very, very, fast."  E.B. slowed to 40 or 50 miles per hour as the black Mustang crossed into westbound oncoming traffic and sped past E.B.'s truck, and started to pass the tractor-trailer in front of E.B., which was forced to pull onto the dirt shoulder to avoid a collision.  E.B. saw the black Mustang veer out of the westbound lane to avoid the oncoming traffic and pull back into the eastbound lane.  As it did so, the black Mustang hit the back of a silver car traveling eastbound, and pushed the car across the highway, underneath the rear wheels of a westbound oncoming tractor-trailer.  After the black Mustang hit the silver car, the Mustang rolled and came to rest in the dirt.

4

As E.B. drove into a dirt lot and got out of his truck, a second Mustang drove up, spun around in the dirt lot, and stopped. E.B. saw someone run over to the second Mustang and get in the passenger seat. The second Mustang then sped away. E.B. thought the person who got in the second Mustang was the driver of the black Mustang because E.B. saw that person standing next to the black Mustang after the collision. E.B. checked on the person in the silver car. The person was deceased.

K.B. testified that when the collision occurred, he was driving an "18 wheeler, a freight liner with a 48-foot trailer." He was driving westbound through the desert, on the SR-58, about 1:00 a.m. There were a couple of tractor-trailers ahead of him and a car behind him. K.B. noticed two tractor-trailers approaching him in the eastbound lane. As K.B. entered the construction zone, he slowed down. He suddenly saw a Ford Fusion sliding sideways toward him, crossing into the westbound lane. The car crashed into his truck. K.B. continued driving as straight as possible to avoid swinging into oncoming traffic. He hit the construction retaining wall on the shoulder of the highway and then his truck came to rest.

D.N. testified that while driving westbound on the SR-58, he saw a Mustang, which was travelling eastbound, "dart out into oncoming traffic. And it whipped back and hit the back of" the Fusion. The collision caused the Fusion to spin out into the westbound path of the tractor-trailer in front of D.N. The Fusion hit the front of the truck, spun, and then hit the side of the truck. The Mustang also spun, hit the truck, hit the Fusion again, and then came to rest. All of the vehicles involved in the accident stopped. D.N. got out of his car to provide assistance. The driver of the black Mustang asked others for a flashlight and asked D.N. for a ride to his brother's car. D.N. refused and told him he needed to wait there. D.N. told the Mustang driver that the California Highway Patrol (CHP) had been called. As D.N. walked over to the trucks that were involved in the accident, he heard someone yell, "The guy is getting in another car and leaving." D.N. saw a second Mustang drive away.

J.S. testified that as he was driving a large rental truck on SR-58, he saw a black car suddenly cut sideways and smash underneath one of the approaching trucks. J.S. stopped to avoid hitting the car. J.S. saw the driver of the black car get out of his car and stagger toward him. The man had blood on him. Then J.S. heard someone yell, "Hey, he's getting away or getting into another car." J.S. saw another car similar to the black wrecked car "vanishing into the distance." J.S. later identified Rebosio as the driver of the black car and identified him in court.

R.S. testified that he and DeJager were friends. DeJager invited him to go with him to Las Vegas. DeJager picked up R.S. in a grey Mustang at R.S.'s home in Gilroy. Rebosio met them at R.S.'s home in a black Mustang. R.S. rode with DeJager and Rebosio drove alone in the black Mustang. During the drive, R.S. saw Rebosio, who was driving in front of DeJager, cross over the double yellow lines on the highway to pass a vehicle. R.S. then saw a crash and lots of swerving headlights. DeJager drove past the accident scene but when he and R.S. did not see Rebosio ahead of them, DeJager turned around and drove back to the accident scene to look for Rebosio. R.S. saw two cars that were "totaled." It appeared that Rebosio's black Mustang had crashed into another car. R.S. saw Rebosio walking around the area. He appeared to be hurt. DeJager pulled into a dirt lot and Rebosio got in the car. He was angry and yelling. Rebosio told DeJager to get going. They drove straight to Las Vegas.

CHP Officer Vargas testified that on September 15, 2018, about 1:20 a.m., he responded to the scene of a traffic accident located on SR-58, in an unincorporated desert area of San Bernardino County. The accident occurred in a highway construction zone. There were two lanes divided by double yellow lines, and a cement barricade (k-rail) on the north side of the westbound traffic lane. The posted speed limit was 55 miles per hour.

At the accident scene, Officer Vargas saw a black Mustang facing southbound in the eastbound lane. A tractor-trailer was rammed up against the k-rail on the north shoulder, adjacent to the westbound lane. A silver Fusion was in the westbound lane.

7

The three vehicles sustained severe damage. Both the front and rear of the black Mustang were damaged. Officer Vargas could not locate the driver of the black Mustang. Officer Vargas noticed the airbag had deployed and had blood on it. Officer Vargas found the driver of the silver Fusion inside the car, deceased.

After investigating the accident scene and interviewing witnesses, Officer Vargas concluded the driver of the black Mustang caused the collision by traveling east in the westbound lane, making a lane change back into the eastbound lane, and striking the rear of the Fusion. This propelled the Fusion into the westbound lane where it collided with a tractor-trailer traveling westbound. The Mustang then collided with the rear wheels of the tractor-trailer, pushing the tractor-trailer into the cement k-rail.

Officer Vargas ran the black Mustang's vehicle identification number (VIN) and discovered the car had been reported stolen. The owner of the stolen car provided Officer Vargas with the phone number Rebosio had given him when arranging to see the car. Officer Vargas dialed the phone number and the cell phone found in the black Mustang rang. Officer Vargas determined that Rebosio was the registered owner of that phone number.

CHP Sergeant Berns, an accident reconstruction specialist, testified that he downloaded the data from the black Mustang's airbag restraint control module (RCM), which senses collision severity and determines whether to deploy the airbag. Sergeant Berns determined from the data that within seconds before activation of the RCM, the black Mustang accelerated to 106.7 miles per hour, before decelerating to zero miles per

hour. Sergeant Berns determined that the black Mustang first collided with the Fusion and then collided with the rear of the tractor-trailer. Sergeant Berns further concluded based on the RCM data that, while driving eastbound, the black Mustang crossed over the double yellow line into the westbound lane, passed other commercial vehicles, and then moved back into the eastbound lane for a brief moment. Because the black Mustang could not sufficiently slow down, the Mustang struck the car in front of it, the Fusion.

On September 15, 2018, at 3:30 a.m., Las Vegas Police Officer Rohr pulled over a grey Mustang for street racing. At trial, Officer Rohr identified DeJager as the driver and Rebosio as a passenger. Officer Rohr testified that R.S. was also a passenger. Rebosio told Officer Rohr his name was Anthony Pederson and said his injuries were from falling down. Officer Rohr cited DeJager for not carrying proof of car insurance and released him and his passengers.

On September 18, 2018, CHP investigators interviewed Rebosio in San Francisco. Rebosio said his injuries on his knees and chest were from his girlfriend. Rebosio denied having been in a car accident or having been in Southern California.

III.

REBOSIO'S APPEAL

A. *Expert Witness Testimony*

Rebosio contends the trial court abused its discretion by allowing Sergeant Berns to provide expert testimony stating that Rebosio violated the Vehicle Code and drove negligently, in disregard for the safety of others. Rebosio argues the jury did not need

9

Sergeant Berns's assistance in deciding whether Rebosio acted with gross negligence. Therefore Sergeant Berns's testimony invaded the province of the jury and constituted an improper statement of guilt.  We disagree.

### 1. *Factual Background*

Sergeant Berns testified that, as an expert witness in traffic accident reconstruction, he assisted in investigating the subject vehicle accident.  Sergeant Berns testified about the physics of the collision and the information he obtained from the black Mustang's RCM.  The prosecutor asked Sergeant Berns if driving over double yellow lines into oncoming traffic constituted a Vehicle Code violation.  Sergeant Berns answered, "yes," and stated the applicable code section was Vehicle Code section 21650. Sergeant Berns also stated that driving at 105 miles per hour was a violation of the Vehicle Code.

The prosecutor then posed the following hypothetical:

"I would like you to assume that there is a black Ford Mustang that is driving on a two-lane highway that is heavily traveled.  I would like you to also assume that it is 1:00 a.m. in the morning; that the speed limit on this highway is 55 miles per hour.  And that this vehicle is traveling – this black Mustang is traveling eastbound.  I would like you to assume that this black Mustang crosses over a solid double yellow line into westbound traffic; that it passes—"

Rebosio objected to the hypothetical on the ground it was not based on facts in evidence. The court overruled Rebosio's objection. The prosecutor continued with the hypothetical: "I would like you to also assume that the Mustang crosses over into oncoming traffic; that the Mustang passes other vehicles. And that the Mustang's speed is determined to be up to 106 miles an hour. Once the Mustang passes the other vehicles, it changes lanes back into eastbound traffic; that when the Mustang does so, it impacts the rear of a Ford Fusion that is also traveling in eastbound lanes. That because of this impact, the Ford Fusion is forced into westbound lanes into oncoming traffic and into an oncoming tractor-trailer combination vehicle killing the driver of the Ford Fusion."

After stating this hypothetical, the prosecutor asked Sergeant Berns whether, in his opinion, the driver of the black Mustang "is driving with the regard for the safety of others?" Rebosio's attorney objected on the ground the hypothetical was improper because it called for an improper conclusion and called for speculation as to the driver's mindset, which was beyond Sergeant Berns's expertise. The court overruled the objection. Sergeant Berns testified: "Yes. I see a lack of regard for the safety of others." He explained that "[r]oadways are designed with safety in mind. The fact that there is double yellow lines, the fact that there's posted speed limits. In this case you mentioned it was nighttime. Driving conditions, regardless of the vehicle speed that the Mustang was passing, that Mustang did cross over the double yellow lines which is a violation of the law, accelerated to a high rate of speed. . . . [G]oing over 100 miles an hour anywhere in the state is against the law. And when you're passing that length of

11

combination of vehicles, it's not prudent. And then when you merge back into the other lane and you rear end another vehicle because your speed is so great, again, that is a poor choice all the way around. And it was in my opinion negligent."

Rebosio's attorney again objected on the ground Sergeant Berns provided improper opinion beyond his expertise and called for speculation as to the driver's mindset. The court overruled the objection. During a jury recess, Rebosio's attorney moved for a mistrial on the grounds Sergeant Berns's opinion was improper expert testimony because it encompassed the state of mind of the driver, which was beyond the expertise of the expert and encompassed an ultimate issue which was for the jury to decide. The court denied the motion for mistrial, concluding that the prosecutor was not asking Sergeant Berns about the driver's state of mind.

2. *Applicable Law*

"While lay witnesses are allowed to testify only about matters within their personal knowledge (Evid. Code, § 702, subd. (a)), expert witnesses are given greater latitude. 'A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.' (Evid. Code, § 720, subd. (a).) An expert may express an opinion on 'a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (Evid. Code, § 801, subd. (a).) In addition to matters within their own personal knowledge, experts may relate information acquired through their training and experience, even though that information may have been

derived from conversations with others, lectures, study of learned treatises, etc." (*People v. Sanchez* (2016) 63 Cal.4th 665, 675 (*Sanchez*); accord, Evid. Code, § 801, subd. (b)).)

Evidence Code section 802 "allows an expert to 'state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based.'" (*Sanchez, supra*, 63 Cal.4th at pp. 678-679.) "An expert's testimony as to information generally accepted in the expert's area, or supported by his own experience, may usually be admitted to provide specialized context the jury will need to resolve an issue." (*Id.* at p. 675.) "[A]n expert has traditionally been precluded from relating *case-specific* facts about which the expert has no independent knowledge. . . . An expert may then testify about more generalized information to help jurors understand the significance of those case-specific facts. An expert is also allowed to give an opinion about what those facts may mean." (*Id.* at p. 676.)

The "distinction between generally accepted background information and the supplying of case-specific facts is honored by the use of hypothetical questions. 'Using this technique, other witnesses supplied admissible evidence of the facts, the attorney asked the expert witness to hypothetically assume the truth of those facts, and the expert testified to an opinion based on the assumed facts. . . .' [Citations.] An examiner may ask an expert to assume a certain set of case-specific facts for which there is independent competent evidence, then ask the expert what conclusions the expert would draw from those assumed facts. If no competent evidence of a case-specific fact has been, or will

be, admitted, the expert cannot be asked to assume it. The expert is permitted to give his opinion because the significance of certain facts may not be clear to a lay juror lacking the expert's specialized knowledge and experience." (*Sanchez*, *supra*, 63 Cal.4th at pp. 676-677; see *People v. Vang* (2011) 52 Cal.4th 1038, 1045.) It is not improper for hypothetical facts to mirror those in the case or for hypothetical questions to reflect the facts of the case. "It is required, not prohibited, that hypothetical questions be based on the evidence. The questioner is not required to disguise the fact the questions are based on that evidence." (*People v. Vang*, *supra*, (2011) 52 Cal.4th at p. 1041.)

"The trial court has broad discretion in deciding whether to admit or exclude expert testimony . . . , and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

 3. *Analysis*

 Citing *People v. Anh The Duong* (2020) 10 Cal.5th 36 (*Duong*), Rebosio argues the trial court erred by overruling his objection to Sergeant Berns's expert testimony responding to hypothetical questions. Rebosio argues the hypothetical was improper because it elicited testimony about his state of mind. He also argues the testimony was improper because it invaded the province of the jury to decide whether he acted with gross negligence, in "disregard for human life or indifference to the consequences of that act." (CALCRIM No. 592.)

14

Penal Code, section 192, in relevant part defines vehicular manslaughter as "the unlawful killing of a human being without malice," by "driving a vehicle in the commission of an unlawful act, not amounting to a felony, and with gross negligence." (Pen. Code, § 192 (c)(1).)

The trial court instructed the jury that, "To prove that the defendant is guilty of gross vehicular manslaughter, the People must prove that: [¶] 1. The defendant, Dominic Rebosio, drove a vehicle; [¶] 2. While driving that vehicle, the defendant, Dominic Rebosio, committed an infraction; [¶] 3. The defendant, Dominic Rebosio, committed the infractions with gross negligence; [¶] AND [¶] 4. The defendant, Dominic Rebosio's, grossly negligent conduct caused the death of another person." The People alleged as to element 2 that Rebosio committed the infractions of crossing over double yellow lines (Veh. Code, § 21460, subd. (a)), speeding (Veh. Code, § 22349, subd. (b)), and making an unsafe lane change (Veh. Code, § 21658, subd. (a)).

The trial court did not abuse its discretion by permitting Sergeant Berns's hypothetical testimony on gross negligence. Sergeant Berns did not provide any testimony regarding Rebosio's actual state of mind and did not testify that Rebosio committed Vehicle Code infractions. The crime of vehicular manslaughter does not require a finding the driver had a specific intent to harm or a finding as to the driver's actual state of mind. The focus is on the conduct of a "reasonable person" and whether the defendant's manner of driving reflects a disregard for human life or indifference to

15

the consequences of that act. (*People v. Jones* (1985) 164 Cal.App.3d 1173, 1182; Pen. Code, § 192, subd. (c)(1).)

"Gross negligence is the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences. [Citation.] 'The state of mind of a person who acts with conscious indifference[] to the consequences is simply, "I don't care what happens."'" [Citation.] The test is objective: whether a reasonable person in the defendant's position would have been aware of the risk involved. [Citation.]" (*People v. Bennett* (1991) 54 Cal.3d 1032, 1036; see *People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1171 (*Nicolas*).) The determination of whether Rebosio acted with gross negligence required a determination of whether the way he acted was so different from how an ordinarily careful person would act in the same situation. (CALCRIM No. 592.)

Rebosio acknowledges that "[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.) Rebosio, however, argues that Sergeant Berns's hypothetical testimony was inadmissible because it invaded the purview of the jury to weigh the evidence and make findings on guilt. But Sergeant Berns did not provide any hypothetical opinion testimony on Rebosio's guilt or conduct. He only testified that the driver in the hypothetical was negligent and his driving demonstrated a lack of regard for the safety of others. Sergeant Berns testified that, based on the assumed hypothetical facts given, "Yes. I see a lack of regard for the safety of others,"

16

and "[G]oing over 100 miles an hour anywhere in the state is against the law. And when you're passing that length of combination of vehicles, it's not prudent. And then when you merge back into the other lane and you rear end another vehicle because your speed is so great, again, that is a poor choice all the way around. And it was in my opinion negligent."

"An expert may then testify about more generalized information to help jurors understand the significance of those case-specific facts." (*Sanchez*, *supra*,63 Cal.4th at p. 675.) Furthermore, "[T]he jury need [not] be wholly ignorant of the subject matter of the expert opinion in order for it to be admissible. [Citation.] . . . Rather, expert opinion testimony "'will be excluded only when it would add *nothing at all* to the jury's common fund of information, i.e., when the 'subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness'" [citation].'" (*People v. Jones* (2012) 54 Cal.4th 1, 60, internal quotes omitted.)

Sergeant Berns's expert testimony was proper because it assisted the jury in determining whether Rebosio's driving was grossly negligent, that is, whether it was so different from how an ordinarily careful person would have driven. (CALCRIM No. 592.) Rebosio's attorney argued during closing argument that the accident was caused by Rebosio driving at an excessive speed and therefore the accident was not caused by Rebosio acting with gross negligence, because "[e]verybody speeds. We all live in the High Desert. How many times does the freeway say construction zone, slow down. We all keep going. The whole freeway keeps moving. In some places you don't even get in

17

the fast lane unless you're doing 85 or you get run over.  Everybody speeds.  [¶]  Now, we're talking about [SR-] 58 late at night.  Is speeding in and of itself grossly negligent?  No.  It's ordinary negligence.  We all do it.  What they're proving is ordinary negligence, not gross negligence on the part of the driver of the black Mustang."  Sergeant Berns's testimony assisted the jury in determining whether Rebosio's driving at the time of the accident was typical or grossly negligent.

Rebosio's reliance on *Duong* for the proposition it was improper for Sergeant Berns to state his opinion regarding Rebosio's state of mind is misplaced.  In *Duong*, the defendant was convicted of first degree murder and second degree murder with a multiple murder special circumstance and various gun use enhancements.  The *Duong* defendant was sentenced to death.  The California Supreme Court held in part that the trial court did not abuse its discretion by excluding the defense expert's proposed opinion testimony about the defendant's state of mind under Penal Code section 29.[1]  (*Duong*, *supra*, 10 Cal.5th at p. 60.)

---

[1] Penal Code section 29 states:  "In the guilt phase of a criminal action, *any expert testifying about a defendant's mental illness, mental disorder, or mental defect* shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."  (*Ibid*., italics added.)

18

The *Duong* court reasoned that the trial court properly concluded the expert's proposed opinion about the defendant's state of mind should be excluded because "'[a] consistent line of authority in California as well as other jurisdictions holds a witness cannot express an opinion concerning the guilt or innocence of the defendant. . . . [T]he reason for employing this rule is not because guilt is the "ultimate issue of fact" to be decided by the jury. Opinion testimony often goes to the ultimate issue in the case. [Citation.] Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.' [Citation.]" (*Duong*, *supra*, 10 Cal.5th at p. 60.)

*Duong* is inapposite because the court did not hold that an expert could not testify regarding gross negligence. The *Duong* court held the expert opinion evidence was inadmissible, not because it was state of mind opinion evidence, but because the expert's testimony amounted to an opinion on the guilt of the defendant. (*Duong*, *supra*, 10 Cal.5th at p. 60.) Sergeant Berns did not provide expert opinion on Rebosio's guilt. He responded to a hypothetical. Sergeant Berns did not mention Rebosio or any specific facts regarding the subject accident. The hypothetical was based on facts Sergeant Berns was told to assume.

In addition, the court instructed the jury that it was required independently to determine the actual underlying facts based on the evidence presented at trial and the jury was not required to rely on Sergeant Berns's expert opinions. (CALCRIM No. 332.) The

jury was instructed that "You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence." The court further instructed the jury that "It is up to you to decide whether an assumed fact has been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion." It is presumed the jury followed these instructions. (*People v. Davis* (2005) 10 Cal.4th 463, 542.)

Rebosio also cites *Nicolas*, *supra*, 8 Cal.App.5th 1165, for the proposition Sergeant Berns provided improper opinion testimony regarding Rebosio's mental state, which was beyond the scope of Sergeant Berns's expertise. In *Nicolas*, the jury found the defendant guilty of vehicular manslaughter with gross negligence. The court in *Nicolas* stated that "[g]ross vehicular manslaughter has been characterized as a general intent crime. [Citation.] But the crime more precisely entails the confluence of two different mental states: general intent in the driving of the vehicle, and gross negligence while committing a traffic violation (in this case 'Speeding') . . . ." (*Id*. at p. 1173.) Rebosio concludes based on this language that Sergeant Berns's testimony that the driver in the hypothetical was acting with "gross negligence," "imprudently," and in disregard "for the safety of others" was testimony regarding the driver's mental state, which was beyond Sergeant Berns's area of expertise.

Rebosio's reliance on *Nicolas* for this proposition is misplaced. While *Nicolas* characterizes gross negligence as a state of mind, *Nicolas* does not discuss or conclude that expert opinion testimony on the element of gross negligence is improper. The

20

*Nicolas* court indicated that "gross negligence," which is synonymous with the term "criminal negligence," does not require a finding as to what the driver was thinking or the driver's actual or specific intent or mental state. (See *People v. Sargent*, *supra*, 19 Cal.4th at p. 1215; *Nicolas*, *supra*, 8 Cal.App.5th at p. 1173 ["Criminal negligence is a separate mental state that is distinct from either general or specific intent."].)

The trial court instructed the jury in the instant case that "*Gross negligence* involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with gross negligence when: [¶] 1. He acts in a reckless way that creates a high risk of death or great bodily injury; [¶] AND [¶] 2. *A reasonable person would have known that acting in that way would create such a risk.* [¶] In other words, a person acts with gross negligence when *the way he acts is so different from how an ordinarily careful person would act in the same situation* that his act amounts to disregard for human life or indifference to the consequences of that act." (Italics added; CALCRIM No. 592.)

Thus, evidence of Rebosio's actual mental state was not required to establish gross negligence. Only evidence of his driving conduct and the circumstances of the accident were required. Sergeant Berns's hypothetical testimony did not address the hypothetical driver's actual mental state nor did Sergeant Berns testify as to Rebosio's mental state. We therefore reject Rebosio's contention Sergeant Berns's testimony was improper because it encompassed Rebosio's state of mind.

21

Based on Sergeant Berns's knowledge and experience as a CHP officer enforcing Vehicle Code violations, and his extensive training and experience in accident reconstruction, the trial court reasonably found that Sergeant Berns's expertise enabled him to provide hypothetical testimony assisting the jury in determining whether Rebosio acted with gross negligence, in a way "so different from how an ordinarily careful person would act in the same situation that his act amounts to disregard for human life or indifference to the consequences of that act." (CALCRIM No. 592.) The trial court therefore did not abuse its discretion in allowing Sergeant Berns's expert opinion testimony in response to the hypothetical questions.

B. *CALCRIM No.* 595

Rebosio contends the trial court violated his due process rights by failing to instruct the jury on all of the elements of gross vehicular manslaughter. We disagree.

"'It is settled that in criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence'" and "'necessary for the jury's understanding of the case.'" (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189; see *People v. Brooks* (2017) 3 Cal.5th 1, 73.)

The trial court instructed on all general principles regarding gross vehicular manslaughter by giving CALCRIM No. 592, which stated that to find gross vehicular manslaughter the jury must find that Rebosio drove a vehicle; while doing so, he committed an infraction with gross negligence; and his grossly negligent conduct caused the death of another person. The court further instructed that the People alleged in the

22

Information that Rebosio committed the infractions of crossing over double yellow lines (Veh. Code, § 21460, subd. (a)), speeding (Veh. Code, § 22349, subd. (b)), and making an unsafe lane change (Veh. Code, § 21658, subd. (a)). The court also instructed the jury: "You may not find the defendant guilty unless all of you agree that the People have proved that the defendant committed at least one infraction and you all agree on which . . . infraction the defendant committed."

The court further instructed the jury on the elements of each of the alleged infractions. As to the speeding infraction, the court instructed: "To prove that the defendant, Dominic Rebosio, committed a violation of the maximum speed law, the People must prove that: [¶] 1. The defendant drove a vehicle on a highway; [¶] AND [¶] 2. The defendant drove faster than 55 mph. [¶] The term *highway* describes any area publicly maintained and open to the public for purposes of vehicular travel and includes a street."

Rebosio asserts that the court erred in failing to inform the jurors they had to find two additional speeding infraction elements: (1) there was driving on a "two-lane undivided highway," with "not more than one through lane of travel in each direction" (Veh. Code, § 22349, subd. (b)(1)), and (2) that there be reasonable highway signing of the 55 miles-per-hour speed limit (Veh. Code, § 22349, subd. (c)).

The trial court was not required to instruct on these additional facts sua sponte because they are particular facts relating to the elements of the speeding infraction. Instruction on such facts constitute a pinpoint instruction, which the trial court is not

required to give sua sponte. (*People v. Middleton* (1997) 52 Cal.App.4th 19, 30; see *People v. Garvin* (2003) 110 Cal.App.4th 484, 489.)

Rebosio argues instruction on the additional two factors is required based on the language in Vehicle Code section 22349, which states in relevant part: "(b) Notwithstanding any other provision of law, no person may drive a vehicle upon a two-lane, undivided highway at a speed greater than 55 miles per hour unless that highway, or portion thereof, has been posted for a higher speed by the Department of Transportation or appropriate local agency upon the basis of an engineering and traffic survey. For purposes of this subdivision, the following apply: [¶] (1) A two-lane, undivided highway is a highway with not more than one through lane of travel in each direction. [¶] (2) Passing lanes may not be considered when determining the number of through lanes. [¶] (c) It is the intent of the Legislature that there be reasonable signing on affected two-lane, undivided highways described in subdivision (b) in continuing the 55 miles-per-hour speed limit, including placing signs at county boundaries to the extent possible, and at other appropriate locations."

Although the jury was not instructed that a violation of Vehicle Code section 22349, subdivision (b) requires the highway to be two lanes, any error in omitting instruction on this was not prejudicial error because it was undisputed that the highway was a two-lane highway. Furthermore, Rebosio did not object to the jury instruction given or request a pinpoint instruction clarifying the type of highway required. "A defendant who believes that an instruction requires clarification must request it." (*People*

*v. Coddington* (2000) 23 Cal.4th 529, 584.)  Therefore, Rebosio forfeited his objection that the instruction failed to state that the jury must find the highway had only two lanes.  (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.)  Rebosio likewise forfeited his objection that the court failed to instruct that reasonable signing of the speed limit was required.  (*Ibid.*)

In addition, the existence of reasonable signing was not an element of the speeding infraction under Vehicle Code section 22349, subdivision (b).  Vehicle Code section 22349 merely states that "[i]t is the intent of the Legislature that there be reasonable signing."  (Veh. Code, § 22349, subd. (c).)  Any instruction on signing would be a pinpoint instruction, which the trial court was not required to give sua sponte.  (*People v. Coddington*, *supra*, 23 Cal.4th at p. 584.)

Furthermore, omission of the speed-limit signing requirement was not prejudicial error.  It is not reasonably probable that the trial outcome would have been more favorable to Rebosio had the trial court instructed the jury that a violation of Vehicle Code section 22349, subdivision (b) required a finding that there must be reasonable speed-limit signing.  (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Cavitt* (2004) 33 Cal.4th 187, 209.)  Omission of such an instruction was harmless because it is undisputed Rebosio was driving over 100 miles per hour, which was far in excess of the 55 miles per hour speed limit.

C. *Jury Instruction on Eyewitness Identification Certainty*

Rebosio contends the trial court violated his state and federal constitutional due process rights by instructing the jury with CALCRIM No. 315. He argues the instruction improperly directs the jury to consider witness certainty when evaluating eyewitness identification. We conclude that under *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*) the instruction did not violate his due process rights.

During closing argument, Rebosio argued the prosecution failed to prove that he was the driver of the black Mustang at the time of the accident. Rebosio maintained that R.S., not Rebosio, was the driver. Witnesses, including J.S. and E.B., described the driver as wearing shorts. Only R.S. was wearing shorts. Rebosio was wearing long pants. In addition, J.S. was the only witness at the crash scene who identified Rebosio as the driver. Using CALCRIM No. 315, the trial court instructed the jury regarding evaluating eyewitness testimony. The instruction listed 15 factors to be considered, including, "How certain was the witness when he or she made an identification?"

After the trial in this case in 2019, the California Supreme Court held in *Lemcke*, *supra*, 11 Cal.5th 644 at pages 646-647, that although the eyewitness certainty factor included in CALCRIM No. 315 is generally an unreliable indicator of accuracy, the model instruction did not violate the defendant's due process rights. The *Lemcke* court stated that, "When considered in the context of the trial record as a whole, listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating

26

identification testimony did not render [the defendant's] trial fundamentally unfair." (*Lemcke*, *supra*, at p. 646.)

The *Lemcke* court noted that the defendant was permitted to call an eyewitness identification expert. In *Lemcke*, the expert testified that there generally was not a close correlation between witness certainty and identification accuracy. The *Lemcke* trial court instructed the jury that it was required to consider the expert's testimony; the prosecution retained the burden of proof to prove the defendant's identity as the perpetrator beyond a reasonable doubt; and witnesses sometimes make honest mistakes. (*Lemcke*, *supra*, at pp. 647, 658, 660.)

The *Lemcke* court acknowledged that, "[c]ontrary to widespread lay belief, there is now near unanimity in the empirical research that 'eyewitness confidence is generally an unreliable indicator of accuracy.'" (*Lemcke*, *supra*, 11 Cal. 5th at p. 647.) The *Lemcke* court stated that, although giving CALCRIM No. 315 does not violate a defendant's due process rights and there was no reversible error, the court intended to refer "the matter to the Judicial Council and its Advisory Committee on Criminal Jury Instructions to evaluate whether or how the instruction might be modified to avoid juror confusion regarding the correlation between certainty and accuracy." The California Supreme Court in *Lemcke* added that, "Acting pursuant to our supervisory powers, we further direct that until the Judicial Council has completed its evaluation, trial courts should omit the certainty factor from CALCRIM No. 315 unless the defendant requests otherwise." (*Lemcke*, *supra*, at pp. 647-648.)

27

The People argue Rebosio forfeited his objection to CALCRIM No. 315 because he did not raise it in the trial court. Regardless of whether Rebosio forfeited his objection, we reject it under *Lemcke*, *supra*, 11 Cal.5th 644. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Under *Lemcke*, *supra*, 11 Cal.5th 644, Rebosio's due process rights were not violated by the court instructing on the witness certainty factor. As the Supreme Court explained in *Lemcke*, the certainty-of-identification factor in CALCRIM No. 315 does not equate witness certainty of identification with accuracy and does not require the jury to presume an identification is accurate just because a witness expresses certainty. (See *Lemcke*, *supra*, at p. 657.) The witness certainty factor was just one of 15 factors the court listed for the jury to consider when evaluating the credibility and accuracy of the eyewitnesses' identification testimony.

In addition, in determining whether there was reversible error in instructing on identification certainty, we must consider the jury instructions as a whole. (*Lemcke*, *supra*, 11 Cal.5th at p. 658.) Here, the jury was instructed that Rebosio was presumed innocent and the People had the burden of proving each element of the offenses beyond a reasonable doubt (CALCRIM No. 220; *Lemcke*, *supra*, at p. 658). The jury was also instructed that "[t]he People have the burden of proving beyond a reasonable doubt that it was [Rebosio] who committed the crime. If the People have not met this burden, you must find the defendant not guilty." (CALCRIM No. 315; see *Lemcke*, *supra*, at p. 658.) The jury was further instructed it "alone, must judge the credibility or believability of the

28

witnesses" and that "[p]eople sometimes honestly . . . make mistakes about what they remember." (CALCRIM No. 226; see *Lemcke*, *supra*, at p. 658.)

Rebosio acknowledges in his appellant's reply brief (ARB) that after he filed his appellant's opening brief, the California Supreme Court in *Lemcke* decided the issue he raised concerning CALCRIM No. 315. Rebosio recognizes in his ARB that *Lemcke* holds that "the giving of the CALCRIM No. 315 instruction with the certainty language did not result in a denial of due process for the defendant in *Lemcke*." Rebosio did not attempt to distinguish *Lemcke* from the instant case or argue that the holding does not apply here. He therefore forfeited any such arguments. (*People v. Niles* (1964) 227 Cal.App.2d 749, 758.)

We conclude that, like the defendant in *Lemcke*, Rebosio "failed to establish that the trial court's decision to include the certainty factor in CALCRIM No. 315 violated his due process rights or otherwise constituted error under the circumstances presented here." (*Lemcke*, *supra*, 11 Cal.5th at p. 669.)

IV.

RESENTENCING UNDER S.B. 567

Rebosio contends his sentence must be vacated and the matter remanded for resentencing in accordance with S.B. 567. We agree.

On December 12, 2019, a jury found Rebosio guilty of vehicular manslaughter (count 1), and hit and run driving resulting in death or serious injury (count 2). During a

29

subsequent bifurcated trial, the trial court found that Rebosio had suffered a prior conviction for residential burglary constituting a strike and a serious felony.

On January 9, 2020, the trial court sentenced Rebosio to an upper term of six years, doubled as a result of the strike, for the vehicular manslaughter conviction. The trial court said that it imposed the upper-term because:

"1. This is a crime involving great violence and great bodily harm.

"(b), factors affecting the defendant is that he has engaged in violent conduct that indicates a serious danger to society.

"(b)(2) the defendant's prior convictions as an adult are becoming numerous and of increasing seriousness. The Court points to a prior 10851 and a prior strike of first degree burglary.

"The Court looks at (b)(5), the defendant's prior performance on probation was unsatisfactory. . . (b)(3) also applies. The victim in this case was particularly vulnerable. He was placed in a position where he couldn't do anything. There's nothing that the victim could have done to save his own life or anyone else's." The trial court did not find any factors in mitigation.

After defendants appealed the judgment and we issued a decision in this case, Rebosio filed a petition for rehearing requesting resentencing based on S.B. 567, amending Penal Code section 1170, subdivision (b), effective January 1, 2022. We granted the petition and permitted the parties to submit supplemental briefing regarding the impact of S.B. 567.

30

Penal Code section 1170, as amended by S.B. 567, provides in subdivision (b)(2) that "[t]he court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."

Penal Code section 1170, as amended, thus made the middle term the presumptive term. A trial court may now only impose an upper term when circumstances in aggravation exist, and the facts underlying the aggravating circumstances have been stipulated to by the defendant or found true beyond a reasonable doubt by the jury or the court acting as the factfinder. (Pen. Code, § 1170, subd. (b)(1), (2), added by Stats. 2021, ch. 731, § 1.3.) The trial judge may, however, rely on certified records of a defendant's prior convictions when considering these enhancements to a sentence without submitting the issue of a prior conviction to a jury. (Pen. Code, § 1170, subd. (b)(3).)

The parties agree S.B. 567 applies retroactively to this case because the judgment was not final as of January 1, 2022, when S.B. 567 took effect. (See *In re Estrada* (1965) 63 Cal.2d 740, 746-748.) But the People argue that this court should not remand the case for resentencing because the trial court found as an aggravating factor that Rebosio suffered a prior conviction for residential burglary, which was a serious felony and a strike. The trial court, however, also imposed the upper term based on other aggravating factors, which were not based on jury or bench-trial findings or stipulated findings. Such

31

additional findings included that the charged crime involved "great violence and great bodily harm," the crime demonstrated Rebosio "engaged in violent conduct that indicates a serious danger to society," his "prior convictions as an adult are becoming numerous and of increasing seriousness," Rebosio's "performance on probation was unsatisfactory," and the victim "was particularly vulnerable."

Although S.B. 567 permits a trial court to impose an aggravated sentence based on a defendant's prior convictions evidenced by certified records of conviction, here, the trial court's aggravated findings included, not only Rebosio's prior conviction for residential burglary, but also various other aggravating factors that were not tried, found true beyond a reasonable doubt, or stipulated to by the defendant, as required under S.B. 567. Therefore, Rebosio is entitled to reversal of his sentence and resentencing upon remand, in accordance with Penal Code section 1170, subdivision (b), as amended by S.B. 567.

V.

DEJAGER'S APPEAL

A. *Sufficiency of Evidence of Aiding and Abetting*

DeJager contends there was insufficient evidence he aided and abetted Rebosio in committing the offense of hit and run resulting in death, in violation of Vehicle Code section 20001, subdivision (b)(2). We disagree.

32

1. *Applicable Law*

Under Penal Code section 31, "All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed." "Thus, a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) An aider and abettor's guilt for the intended crime "is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." (*Ibid.*)

"[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; . . . (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, [and] (3) by act or advice aids, promotes, encourages, or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561; accord, *People v. Johnson* (2016) 62 Cal.4th 600, 630.)

DeJager was tried for committing the crime of hit and run resulting in death, as an aider and abettor, in violation of Vehicle Code section 20001. Subdivision (a) of section 20001 provides: "The driver of a vehicle involved in any accident resulting in injury to a person, other than himself or herself, . . . shall immediately stop the vehicle at the scene of the accident and shall fulfill the requirements of Sections 20003. . . ." Section 20003 requires the driver to stop and provide certain personal information to the other driver and

to police officers at the scene of the accident.  In addition, the driver is required to render reasonable assistance to any person who is injured.  (Veh. Code, § 20003.)

"[I]n order to convict a driver of a vehicle of felony hit-and-run driving it is essential that the driver knows that an accident has occurred [citations], knows that he was involved in the accident [citations], and knowingly leaves the scene of the accident either with knowledge that the accident resulted in injury or with knowledge that the accident was of such a nature that one would reasonably anticipate that the accident resulted in injury to another [citations]."  (*People v. Hamilton* (1978) 80 Cal.App.3d 124, 132.)

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'"  (*People v. Bolin* (1998) 18 Cal.4th 297, 331; see *People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  If the circumstances reasonably justify the trier of fact's findings, this court's conclusion that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment.  (*People v. Jones* (2013) 57 Cal.4th 899, 961.)

### 2. *Analysis*

DeJager does not dispute that Rebosio was the driver of the black Mustang, that Rebosio knew that an accident had occurred, that Rebosio was involved in the accident, and that he knew that the accident resulted in injury to others or knew that it was probable that it resulted in injury. However, DeJager argues there was insufficient evidence he aided and abetted Rebosio in committing the hit and run offense because it was completed before DeJager arrived at the accident scene. DeJager asserts that the hit and run offense was completed when Rebosio walked away from the accident scene before DeJager arrived. There is substantial evidence to the contrary.

Evidence that the hit and run crime offense was incomplete when DeJager arrived at the accident scene includes testimony Rebosio had not yet left or fled from the accident scene. CHP Officer Vargas testified that the collision occurred on Highway 58, in the middle of "open desert." Officer Vargas further stated that at the scene of the accident, it was dark. There was no lighting other than the patrol vehicle lights. This evidence demonstrated it was not reasonably feasible for Rebosio to leave the accident scene without the assistance of someone with a vehicle.

R.S., who was DeJager's friend and a passenger in DeJager's car, testified that DeJager picked up Rebosio in the middle of the accident scene. When DeJager arrived at the scene, he and DeJager saw Rebosio's damaged car and another car that had crashed, and then saw Rebosio "walking around like he was hurt from the accident." He was limping. J.S. testified he noticed Rebosio was bloody, staggering, and mumbling near the

35

black Mustang. J.S. then saw Rebosio suddenly, amid the "chaos," get into a car, which drove away. As Rebosio was leaving in DeJager's car, J.S. heard other witnesses yell, "Hey, he's getting away." D.N., who saw the vehicle collision and stopped to provide assistance, testified that right after the accident Rebosio got out of the black Mustang, asked others for a flashlight, and then immediately asked D.N. to "give him a ride to another waiting car." D.N. refused and told Rebosio to wait for the CHP to arrive. D.N. then saw DeJager pull up in his grey Mustang, Rebosio got in, and they drove straight to Las Vegas.

This evidence as a whole supports a reasonable finding that the hit and run offense was not completed until Rebosio fled in DeJager's car. Up until that point, Rebosio remained at the accident site. It would have been extremely difficult and unlikely he would have left on his own because it was 1:20 a.m., it was dark, the accident scene was in the middle of the desert, Rebosio was limping, he was alone, and his car was not operating. No one offered him a ride, until DeJager arrived and assisted Rebosio in fleeing from the accident scene.

DeJager alternatively argues there was insufficient evidence he aided and abetted Rebosio in committing the hit and run offense because there was no evidence DeJager committed the requisite actus reus of encouraging or otherwise persuading Rebosio to leave the accident scene. We disagree.

Proof of aider and abettor liability requires proof of "conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35

36

Cal.4th 1219, 1225; see *People v. McCoy*, *supra*, 25 Cal.4th at p. 1117.) The actus reus of an aider and abettor can be established by evidence of an act or advice that "aids, promotes, encourages, or instigates, the commission of the crime." (*People v. Beeman*, *supra*, 35 Cal.3d at p. 561; accord, *People v. Prettyman* (1996) 14 Cal.4th 248, 259; *People v. Johnson*, *supra*, 62 Cal.4th at p. 630.) Here, there was substantial evidence of DeJager assisting Rebosio in committing the hit and run offense by picking him up at the accident scene and immediately driving off with Rebosio to Las Vegas.

In *People v. Holford* (1965) 63 Cal.2d 74, the court discussed aiding and abetting liability. The defendant in *Holford* caused a vehicle collision and was convicted of hit and run. His passenger encouraged the *Holford* defendant to leave the accident scene. The court in *Holford* concluded that the passenger was a principal and accomplice in the commission of the hit and run offense because he "encouraged the defendant to leave the scene of the accident" and he had "acquired the same knowledge concerning the nature of the accident as did defendant." (*Id*. at p. 81.)

DeJager argues *Holford* is distinguishable because DeJager was neither the driver nor passenger in the vehicle involved in the accident and there was no evidence he took any affirmative action to encourage or persuade Rebosio to leave the accident scene. Even though the *Holford* facts are distinguishable, *Holford* is instructive in explaining aider and abettor principles applicable in the instant case. In *Holford*, the court explained that "Penal Code section 31 provides that those 'concerned in the commission of a crime' constitute principals 'whether they directly commit the act constituting the offense, or aid

37

and abet in its commission, or, not being present, have advised and encouraged its commission. . . .'  The person who advises and encourages the commission of the crime while present at its perpetration surely falls within the definition of a principal." (*Holford*, *supra*, 63 Cal.2d at p. 81.)  This includes "a passenger who advises and encourages the driver to leave the scene of the accident, knowing that someone has been injured."  (*Holford*, *supra*, 63 Cal.2d at p. 82.)

Here, unlike in *Holford*, *supra*, 63 Cal.2d 74, DeJager was not the driver of the black Mustang that caused the deadly automobile collision and was not present during the collision.  He arrived during the immediate aftermath, during which he assisted Rebosio in unlawfully fleeing from the accident scene.

DeJager argues there is no evidence he said anything advising or encouraging Rebosio to flee from the accident scene.  Even if there was no evidence of this, evidence of DeJager's actions was more than sufficient to support DeJager's hit and run conviction based on aiding and abetting.  There was evidence DeJager assisted Rebosio by picking him up at the accident scene right after the collision and driving him directly to Las Vegas, knowing that Rebosio was involved in the accident and therefore should have remained at the scene to assist the injured, provide his personal information, and report the accident to law enforcement.  We therefore conclude there was substantial evidence to support DeJager's conviction as an aider and abettor of Rebosio's hit and run offense.

B.  *Admissibility of Evidence of the Las Vegas Stop and Car Theft*

DeJager contends the trial court abused its discretion by allowing evidence of the Las Vegas traffic stop and evidence of Rebosio's theft of the black Mustang.  We disagree.

The trial court has broad discretion in determining whether evidence is relevant.  (*People v. Williams* (2008) 43 Cal.4th 584, 634.)  Even if the evidence is relevant, the trial court has the discretion to exclude it under Evidence Code section 352.  This statute provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.) A trial court's discretionary evidentiary ruling under this statute shall not be disturbed on appeal unless there is a showing of a manifest miscarriage of justice.  (*People v. Williams*, *supra*, at pp. 634-635.)

1.  *Evidence of the Las Vegas Traffic Stop*

DeJager filed a motion in limine requesting the court to exclude evidence of the Las Vegas traffic stop.  The trial court denied the motion, ruling the traffic stop evidence was admissible.  The court found that under Evidence Code section 352, the probative value of the traffic stop evidence outweighed its prejudice.

The traffic stop evidence included evidence that Officer Rohr pulled over DeJager in Las Vegas at 3:30 a.m., a little over two hours after the deadly accident involving Rebosio's black Mustang.  DeJager's grey Mustang appeared to be street racing on Las

Vegas Boulevard. During the traffic stop, Officer Rohr smelled marijuana and alcohol in the car. Rebosio and R.S. were passengers in DeJager's grey Mustang. Officer Rohr noticed Rebosio had blood on him. Rebosio gave Officer Rohr a false name and said his injuries were from falling down. Officer Rohr cited DeJager for not carrying proof of car insurance and then released him and his two passengers. The trial court admitted the traffic stop evidence over DeJager's objection, finding that the traffic stop evidence was relevant, admissible evidence.

The Las Vegas traffic stop evidence was relevant to show that, even though Rebosio was legally required to report his involvement in the deadly accident and had an additional the opportunity to do so during the Las Vegas traffic stop, he intended to conceal his involvement. The evidence was also relevant to show DeJager assisted Rebosio in fleeing from the accident scene in violation of Vehicle Code sections 20001 and 20003.

The traffic stop evidence further demonstrates Rebosio's consciousness of guilt and DeJager's guilt, based on aiding and abetting Rebosio in committing the hit and run offense. The evidence shows that Rebosio attempted to avoid law enforcement discovering his involvement in the accident by giving Officer Rohr a false name and lying to the officer about how he was injured. There is also evidence that Officer Rohr interviewed DeJager and Rebosio separately and they both came up with the same false story and same false name for Rebosio. This suggests DeJager and Rebosio planned beforehand what they would say if stopped by law enforcement.

40

DeJager argues that even if the evidence of the traffic stop was relevant, it should have been excluded under Evidence Code section 352 because its highly prejudicial effect far outweighed any probative value. We disagree. The traffic stop evidence of Rebosio fleeing the accident scene in DeJager's car, DeJager driving straight to Las Vegas, Rebosio not disclosing to Officer Rohr that he had recently been in the accident, and Rebosio giving Officer Rohr a false name and lying about how he received his injuries was highly probative. The probative value of the traffic stop evidence outweighed any prejudice, which was minimal. Furthermore, any error in allowing the traffic stop evidence does not constitute prejudicial error. It is not reasonably probable the defendants would have reached a more favorable outcome had the traffic stop evidence been excluded. (*People v. Fuiava* (2012) 53 Cal.4th 622, 671; *People v. Watson*, supra, 46 Cal.2d at p. 836.)

2. *Evidence of Theft of the Black Mustang*

Over DeJager's objection, the trial court permitted evidence that Rebosio stole the black Mustang he was driving during the accident. The court instructed the jury that it could only consider the evidence if the prosecution proved that Rebosio committed the vehicle theft. The jury was instructed that, if the prosecution did not meet its burden of proving the offense, the jury must disregard the evidence. If the jury found Rebosio committed the vehicle theft, the jury could consider the evidence for the limited purposed of deciding whether (1) Rebosio was the person who committed the charged offenses of gross vehicular manslaughter and hit and run resulting in death or (2) Rebosio had a

41

motive to commit the hit and run offense.

The court further instructed the jury not to consider the evidence for any other purpose and not to conclude from the evidence that Rebosio has a bad character or is disposed to commit crime. The trial court also instructed that if the jury concluded Rebosio committed the vehicle theft, that conclusion was only one factor to consider along with the other evidence and was not sufficient alone to prove either of the charged offenses. (CALCRIM No. 375.)

DeJager contends that evidence that Rebosio stole the black Mustang[2] should have been excluded under Evidence section 352 because it was highly prejudicial and of little probative value. DeJager argues that the fact that the black Mustang was a stolen vehicle was irrelevant to the charges of gross vehicular manslaughter and hit and run resulting in death. DeJager asserts that the evidence was prejudicial because it indicated that Rebosio was of bad character because he was a car thief, and DeJager was also of bad character, by his association with Rebosio.

Although the vehicle theft evidence disclosed that Rebosio was a vehicle thief, it was relevant to the charges. It supports a finding that Rebosio was the driver of the black Mustang involved in the accident. DeJager argues that the evidence was unnecessary to establish this fact. However, Rebosio disputed that he was the driver of the black

---

[2] DeJager states in his motion in limine and appellant's opening brief (AOB) that the stolen vehicle driven by Rebosio was grey. This appears to be stated in error. Substantial evidence establishes that the stolen vehicle Rebosio was driving was a black Mustang. DeJager drove a grey Mustang.

Mustang. During closing argument, his attorney argued the prosecution had failed to prove that he was the driver of the black Mustang at the time of the accident. Rebosio maintained that the evidence supported a finding that R.S., not Rebosio, was the driver. The vehicle theft evidence also was relevant to Rebosio's motive to commit the hit and run offense. The jury could reasonably infer from the evidence that Rebosio fled the accident scene to avoid being apprehended for the theft of the black Mustang.

In addition, any prejudice from allowing the evidence was minimized by the trial court instructing the jury to consider the evidence only for the limited purpose of determining motive and intent, and only if the jury found that the prosecution had proven that Rebosio had committed the vehicle theft. It is presumed the jury followed these instructions. (*People v. Thomas* (2011) 51 Cal.4th 449, 487; *People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

## VI.

## CUMULATIVE ERROR

Rebosio and DeJager contend that, even if the asserted errors were not individually prejudicial, their cumulative effect constitutes reversible prejudicial error. We disagree. A predicate to a claim of cumulative error is a finding of multiple errors, which when considered collectively, are prejudicial. (*People v Mora and Rangel* (2018) 5 Cal.5th 442, 499; *People v. Rogers* (2006) 39 Cal.4th 826, 911.) Because we conclude there was no error, we reject defendants' contention there was cumulative error. (*People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236.)

## VII.

## DISPOSITION

Rebosio's sentence is vacated and this case is remanded for resentencing of Rebosio consistent with S.B. 567. In all other respects, the judgment is affirmed as to both Rebosio and DeJager.

Following Rebosio's resentencing, the trial court shall forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER
Acting P. J.

MILLER
J.

44